## COMMONWEALTH *vs.* THOMAS N. LACAVA.

Worcester. November 8, 2002. - February 21, 2003.

Present: MARSHALL, C.J., GREANEY, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Assistance of counsel, Instructions to jury. *Constitutional Law,* Assistance of counsel, Fair trial. *Insanity. Mental Impairment. Homicide. Malice.*

A defendant was not deprived of the effective assistance of counsel in a case of murder in the first degree, where defense counsel's decision to forgo the defense of insanity and to focus on the possibility of securing a reduced verdict by presenting a theory of diminished capacity to the jury was not manifestly unreasonable [712-716]; where the defendant's claim that his counsel failed to provide an adequate defense based on diminished capacity was without merit [716-718]; where defense counsel's decision, as part of the trial strategy, to refuse the judge's offer to give a "humane practice" instruction regarding statements the defendant had made to the police and others was not manifestly unreasonable [719-720]; where it could not be said that defense counsel's strategy of advising the defendant to plead guilty to violating a protective order during the commission of the crime was manifestly unreasonable in the context of the challenges posed by the evidence [720-721]; where, given that the defendant received an instruction by the judge to the jury on "heat of passion," which was not warranted by the evidence, there was no substantial likelihood of a miscarriage of justice in defense counsel's failing to present a voluntary manslaughter defense based on provocation or sudden combat and arguing instead only that portion of the evidence that was consistent with and supported the rest of the theory of diminished capacity [721-723]; and where any error regarding the State-issued institutional clothing the defendant wore during the course of his trial was harmless, and did not create a substantial likelihood of a miscarriage of justice [723-724].

INDICTMENT found and returned in the Superior Court Department on February 16, 1994.

The case was tried before *Peter M. Lauriat,* J., and motions for a new trial, filed on August 15, 1996, and June 11, 1999, were heard by *Daniel F. Toomey,* J.

*Benjamin H. Keehn,* Committee for Public Counsel Services, for the defendant.

*Christopher P. Hodgens*, Assistant District Attorney, for the Commonwealth.

CORDY, J. Following a jury trial, Thomas N. LaCava was convicted of the deliberate, premeditated murder of his estranged wife. LaCava was also indicted for violating a protective order during the commission of the murder, but pleaded guilty to that charge before the close of trial. LaCava appeals from his conviction of murder in the first degree and from the denial of his motions for a new trial.

LaCava's strategy at trial was to challenge the elements of premeditation and malice based on diminished mental capacity. He admitted shooting and killing his wife, but attempted to show that, due to his deteriorating mental state, he was unable to premeditate or form the requisite malice necessary for murder in the first degree at the time he pulled the trigger. He was therefore, he argues, guilty only of voluntary manslaughter, or, at most, murder in the second degree. On appeal LaCava claims that his trial counsel was ineffective by (1) failing to pursue a defense of lack of criminal responsibility, (2) ineffectively presenting the defense theory of diminished capacity, (3) waiving a "humane practice" instruction regarding statements LaCava made to the police and others, (4) advising him to plead guilty to violating the protective order, and (5) failing to present an adequate voluntary manslaughter argument based on provocation. He also claims that his right to a fair trial was abridged because he was dressed in State-issued institutional clothing during the course of his trial. Finally, LaCava asks us to invoke our power under G. L. c. 278, § 33E, to reduce the verdict to manslaughter, or to order a new trial. For the reasons set forth below, we affirm the conviction and decline to exercise our powers under G. L. c. 278, § 33E, to order a new trial or reduce the murder conviction to a lesser degree of guilt. We also affirm the orders denying his motions for a new trial.

1. *Background.* We summarize the evidence in its light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised.

The facts as to the death of the victim are largely undisputed. In the early evening of January 3, 1994, LaCava shot and killed his wife while she was sitting in her automobile outside an

apartment she shared with one of her daughters. The steady deterioration of their marriage of thirty years preceded the shooting.

In 1991, the victim told LaCava that she wanted a divorce and later that year or in 1992 she filed a complaint for divorce. Between 1991 and 1993, the couple attempted a reconciliation but the relationship remained strained. They mostly lived apart and sporadically attended marital counselling sessions.[1] They were never able to reconcile. LaCava, however, remained obsessed with his wife, constantly longing for their relationship to rekindle. In the spring of 1993, LaCava learned that his wife was seeing someone else. On April 15, 1993, the victim obtained a protective order,[2] but LaCava continued to follow his wife, using rental vehicles so that she would not recognize him. LaCava also spoke to friends about his intention to kill himself, and, in the months preceding the murder, about his intention to kill his wife as well. These conversations included scenarios formulated by LaCava as to how he might kill his wife at her apartment or when she was leaving work, and discussions about how to purchase a handgun without obtaining a firearm identification card. Eventually, LaCava purchased a "black powdered" handgun from a dealer in Vermont and left it in the cellar of the marital home. Subsequently he purchased ammunition in Kittery, Maine.

A trial date in the divorce action was set for January 10, 1994. On December 18, 1993, LaCava loaded his automobile and drove to Florida, in what he termed an attempt to start a new life for himself. However, on New Year's Eve, LaCava unexpectedly returned from Florida and made an attempt to contact his wife to try and reconcile, or at least retain possession of the marital home that his wife was seeking to sell in connection with the divorce action.[3] On January 3, after being told by his daughter to stop trying to contact the victim, he went to the marital home to pick up his gun. He then ate lunch

---

[1]LaCava resided in the marital home and his wife moved into an apartment.

[2]The protective order was renewed and was in effect at the time of the murder.

[3]LaCava had repeatedly expressed his anger to others about losing the "dream house" he and his wife had built on a lake, and also about his wife's efforts to include his mother's house as property of the marital estate. LaCava

at a local diner, calmly spoke to an acquaintance there, checked into an area motel, wrote checks to pay bills, rented an automobile at the Worcester Airport, and drove to the victim's apartment complex to lie in wait for her arrival. In addition to the handgun, he brought along knives, handcuffs, duct tape, rope, a plastic bag, and a filter-type mask that LaCava admitted he had with him should his wife try to spray him with mace.

When the victim arrived home, she backed her vehicle into a parking space. LaCava blocked her in with his automobile and approached with his handgun, now loaded, at his side. According to LaCava, the victim looked at him through the automobile windshield with an expression of "disdain" or "anger," and "made a move with her whole body like she was going to drive the car." He began firing his weapon, methodically walking alongside the automobile discharging all five of its bullets into the driver's compartment, killing the victim.[4] LaCava testified that he then turned the gun on himself, but was out of ammunition. He entered his vehicle and sped out of the parking lot with his lights off. He disposed of the gun in a park, and spent the next twelve hours in a destructive pattern of behavior, stabbing himself numerous times about the neck and abdomen.

At approximately 8:30 A.M. the next day, a bleeding LaCava walked into the Connecticut State police barracks in Danielson. He made "fragmented statements" regarding hurting his wife and was transported to a hospital for medical care for his self-inflicted wounds. While LaCava was at the hospital, it became known to the Connecticut State police that he was a suspect in the killing of his wife in Worcester. Consequently, he was advised of his Miranda rights and briefly questioned by a Connecticut State police detective. During this questioning, LaCava told the detective that he shot his wife with a gun and that he had thrown the gun away in a State park.[5]

In preparing a defense, LaCava's trial counsel retained a

---

testified at trial that his mother had transferred her house to him years earlier as part of her estate plan.

[4] An "x" had been carved into the bullets to make them particularly destructive on impact. At trial, LaCava admitted that he had altered the bullets but claimed he intended to use them on himself.

[5] The gun was subsequently recovered by the Connecticut State police.

forensic psychologist, Dr. Frederic Krell, to determine whether LaCava's psychological state might provide the basis for a lack of criminal responsibility (insanity) defense as set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). After conducting his evaluation, Dr. Krell informed counsel that in his opinion LaCava did not satisfy the requirements for an insanity defense, in that he did not suffer from a mental disease or defect. He did opine, however, that LaCava suffered from both a personality disorder reflected in his self-centeredness and controlling behavior, and reactive depression caused by a combination of events in his life including the breakdown of his marriage, the recent loss of his job, and the prospect of losing everything for which he had worked, including his home. He further concluded that, as a result of these conditions, LaCava had been unable to process information, manage his feelings, or control his behavior at the time of the shooting.

In light of Dr. Krell's assessment and on the basis of his own investigation and review of the evidence in the case, trial counsel opted to forgo an insanity defense and pursue a diminished capacity theory, as outlined in *Commonwealth* v. *Gould*, 380 Mass. 672, 680-682 (1980), in an effort to secure a verdict of less than murder in the first degree. This strategy proved unsuccessful.

LaCava subsequently filed a timely notice of appeal and a motion for a new trial based on ineffective assistance of counsel. After an evidentiary hearing, the motion for a new trial was denied. Thereafter, LaCava filed a second motion for a new trial raising another ground for his claim of ineffective assistance of counsel, and a claim that he had been deprived of his right to a fair trial because he had been dressed in institutional clothing throughout the trial. After a further evidentiary hearing, the motion judge denied this motion as well, concluding that LaCava had waived the latter claims by failing to include them in his first motion for a new trial. The judge further concluded that his refusal to consider the merits of the new claims would not result in a miscarriage of justice.

2. *Discussion.* "In evaluating a claim of ineffective assistance of counsel in a case of murder in the first degree, we begin by determining whether there was a serious failure by trial counsel.

If so, then we determine whether the failure resulted in a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002). *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). In determining whether there has been a serious failure, we give trial counsel's tactical decisions due deference, and "do not 'second guess competent lawyers working hard for defendants who turn on them when the jury happen to find their clients guilty.' " *Commonwealth* v. *Street*, 388 Mass. 281, 285 (1983), quoting *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979). Unless a tactical decision of trial counsel was "manifestly unreasonable when made," we will not find ineffectiveness. *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). Because all but one of the claims raised by LaCava involve tactical decisions made by his trial attorney, we review them to see if they were manifestly unreasonable, and, if so, whether a substantial likelihood of a miscarriage of justice has resulted.

a. *Trial counsel's failure to pursue an insanity defense.* The rule with respect to lack of criminal responsibility in the Commonwealth is that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). LaCava claims that even though his own expert determined that he did not have a mental disease or defect within the meaning of the *McHoul* case, there was sufficient evidence of his deteriorated state of mind admitted at trial to warrant a jury instruction on lack of criminal responsibility. Trial counsel's failure to request such an instruction, he therefore contends, was a serious failure. Additionally, LaCava claims that Dr. Krell erred in forming his opinion that LaCava did not have a mental disease or defect by incorrectly relying on the definition of mental illness set forth in regulations promulgated by the Department of Mental Health, and that trial counsel was ineffective in failing to recognize this error.[6]

We begin our analysis by noting that, even if there had been

[6]The Department of Mental Health regulations at 104 Code Mass. Regs. § 3.01 (now codified 104 Code Mass. Regs. § 27.05[1] [1997]), defined

sufficient evidence admitted at trial to warrant a jury instruction on insanity had LaCava sought one, it does not follow that the failure to pursue such a defense was ineffective. The decision regarding the best defense or combination of defenses to pursue at trial is a tactical decision for which trial counsel is largely, although not always exclusively, responsible. *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 758 (2002) (counsel properly abandoned weaker defense of identity and focused on diminished capacity). Consequently, we look to whether counsel's decision to forgo the defense of insanity was manifestly unreasonable. It was not. See *Commonwealth* v. *Hardy*, 426 Mass. 725 (1998).

Trial counsel was confronted with the opinion of his own qualified forensic expert, arrived at after conducting a comprehensive investigation into LaCava's personal history and his state of mind at the time of the shooting,[7] that LaCava did not suffer from a mental disease or defect. It was not unreasonable for counsel to consider this opinion as a serious impediment to an insanity defense, especially in light of other evidence inconsistent with such a defense. LaCava had no history of mental illness prior to the breakdown of his marriage; he had enjoyed both a long-term marriage and work history. LaCava's conduct in the days preceding the killing was completely rational and measured. There was overwhelming evidence that LaCava had planned and intended the murder of his wife, including: his purchase of a gun from a Vermont gun dealer for the purpose of killing not only his wife but perhaps himself; his purchase of ammunition in Maine and his subsequent modification of that ammunition to ensure maximum destruction; his frequent discussions with friends about his plans to kill his wife because of his anger over their impending divorce; the weapons and paraphernalia he assembled and brought with him to the

mental illness as a "substantial disorder of thought, mood, perception, orientation or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life, but shall not include alcoholism."

[7]In preparing his evaluation of LaCava's history and mental state, the defense expert met with LaCava at Bridgewater State Hospital on four occasions, reviewed police reports and witness statements, and interviewed the psychologists who counselled him during the breakup of his marriage, long-time friends, neighbors, and family members with whom he had spent time shortly prior to the murder.

confrontation for the purpose of disabling, kidnapping, and ultimately killing his wife; and, finally, the evidence of a purposeful escape from the scene and disposal of the murder weapon in order to avoid detection. The trouble with an insanity defense in this case "was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Satterfield,* 373 Mass. 109, 111 (1977).

In these circumstances, it was not manifestly unreasonable for counsel to focus on the possibility of securing a reduced verdict by presenting a theory of diminished capacity to the jury, a theory that could be conveyed effectively through the testimony of his expert. The expert was prepared to testify that LaCava did not have the ability to control his conduct at the time he faced his wife, saw what he believed was her expression of disdain, and fired the weapon.

Cases relied on by LaCava to support the proposition that his counsel was ineffective for not pursuing an insanity defense in his behalf present different circumstances. In *Commonwealth* v. *Roberio,* 428 Mass. 278 (1998), we reversed a conviction of murder in the first degree, finding trial counsel ineffective for not investigating an insanity defense where counsel was aware of facts that raised a reasonable doubt as to the defendant's mental condition. In *Commonwealth* v. *Westmoreland,* 388 Mass. 269 (1983), we found counsel ineffective where, after trying the case based on two principal defenses — insanity and mental impairment — he inexplicably abandoned those two defenses (for which there was expert testimony) in his closing in favor of a defense of provocation (for which there was no evidence introduced at trial). In *Commonwealth* v. *Street,* 388 Mass. 281, 281 (1983), we found trial counsel ineffective when, at the "eleventh hour," he abandoned the insanity defense in his closing after raising it in his opening and introducing evidence at trial raising a substantial question of criminal responsibility. Here, in contrast, counsel investigated the avenue of an insanity defense with an expert, determined, in advance of trial, not to pursue it, and implemented the mental impairment strategy consistently throughout the trial. In addition, the tactical decision to eschew the insanity defense in favor of a diminished capacity strategy was a decision that the motion judge found

counsel had extensively discussed with LaCava, and with which LaCava was in agreement. LaCava's informed and voluntary agreement to proceed in accordance with trial counsel's recommendation further undermines (although does not preclude) his ability now to claim that counsel was ineffective for pursuing that strategy at trial. See *Commonwealth* v. *Finstein*, 426 Mass. 200, 204 (1997).

Finally, LaCava makes much of the fact that Dr. Krell used the Department of Mental Health regulations defining mental illness in determining whether LaCava suffered from a mental disease or defect. At the evidentiary hearing on his first motion for a new trial, LaCava presented the testimony of another psychiatric expert to the effect that a "personality disorder" may satisfy the mental disease or defect prong of the *McHoul* standard. LaCava also argues that whether he suffered from a mental disease or defect is a question left to the jury to decide. These arguments are not persuasive on the issue whether counsel was ineffective in not pursuing an insanity defense. First, as Dr. Krell testified at the hearing on the motion for a new trial, although some personality disorders and depression afflictions might qualify as mental diseases or defects, those suffered by LaCava did not reach that level. Second, even if the question whether LaCava suffered from a mental disease or defect would, if contested, be a question for the jury to decide, Dr. Krell's testimony at trial that in his opinion LaCava did not suffer from such conditions would have been fatal to the defense; and third, as noted above, trial counsel's decision to accept Dr. Krell's opinion that LaCava did not suffer from a mental disease or defect sufficient to satisfy the *McHoul* requirement was also based on his investigation that revealed substantial, if not overwhelming, evidence inconsistent with an insanity defense. In these circumstances, we see no ineffectiveness in trial counsel's use and acceptance of Dr. Krell's opinion and report to pursue an alternative strategy to that of insanity.

b. *Trial counsel's presentation of diminished capacity.* Trial counsel attempted to show that LaCava had a diminished mental capacity at the time he shot his wife, thereby "render[ing] him unable either to form the specific intent to kill or to premeditate." *Commonwealth* v. *Laurore*, 437 Mass. 65, 70

(2002). See *Commonwealth* v. *Gould*, 380 Mass. 672, 680 (1980).[8]

Under the theory of murder presented at trial, the Commonwealth was required to prove that LaCava unlawfully killed his wife with malice aforethought and deliberate premeditation. *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). Our holding in the *Gould* case specifically permits a defendant to attack the premeditation aspect of murder in the first degree through the use of psychiatric evidence. See *Commonwealth* v. *Gould*, *supra* at 673. In addition, the element of malice, which distinguishes murder from manslaughter, also may be negated by showing a lack of specific intent due to mental impairment.[9]

---

[8]In *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), the court reasoned, "We conclude that psychiatric testimony may properly be offered to distinguish 'between "intent" in the sense of a conscious desire, "planning" in the sense of considering the mechanical feasibility of effectuating that desire, and "premeditation" in the sense of critically evaluating the pros and cons of proceeding to effectuate the desire [thereby explaining] in understandable terms how a person could logically entertain an intent, plan the effectuation of that intent, but not [deliberately] premeditate regarding the objective of that intent.' " *Id.* at 680, quoting Dix, Psychological Abnormality as a Factor in Grading Criminal Liability: Diminished Capacity, Diminished Responsibility, and the Like, 62 J. Crim. L., Criminology & Police Sci. 313, 325 (1971).

[9]Malice is a necessary element of both murder in the first degree and murder in the second degree. The nature of malice necessary to a conviction of murder in the first degree is a "specific intent to kill," *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001), while the element of malice necessary for a conviction of murder in the second degree can be satisfied by one of three "prongs" including proof of a specific intent to kill or a specific intent to inflict grievous bodily harm, or proof of circumstances in which a reasonably prudent person would have known, according to common experience, that there was a plain and strong likelihood that death would follow the contemplated act. *Commonwealth* v. *Azar*, 435 Mass. 675, 681-682 (2002). *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

The judge instructed the jury on all three prongs of malice during his description of the elements of murder in the first degree, where only the first prong of malice can support a conviction of deliberately premeditated murder. See *Commonwealth* v. *Simpson*, *supra*. Although this instruction was error (neither objected to nor raised in this appeal), the judge's instruction on deliberate premeditation mitigated the error insofar as it emphasized that the jury must specifically find an "intent to kill" in order for them to convict LaCava of murder in the first degree by premeditation (the only theory submitted to them). In these circumstances, "the erroneous malice instruction . . . raises no substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Daye*, 435 Mass. 463, 478 (2001), and cases cited.

*Commonwealth* v. *Grey*, 399 Mass. 469, 470 (1987) ("The admission in evidence of the defendant's mental condition is appropriate because it bears on the question whether the crime of murder was committed at all"). See *Commonwealth* v. *Vizcarrando*, 427 Mass. 392, 396 (1998), *S.C.*, 431 Mass. 360 (2000); *Commonwealth* v. *Sires*, 413 Mass. 292, 299 (1992) (evidence of intent and knowledge relevant to whether murder was committed at all). Consequently, LaCava's ability to premeditate or to form the requisite specific intent required for malice were relevant issues at trial subject to attack by the defense in an effort to reduce the charge from murder in the first degree to murder in the second degree, or to manslaughter.

LaCava's claim that his trial counsel failed to provide an adequate defense based on diminished capacity is without merit. While any defense in this case based on an inability to premeditate would be difficult in light of the overwhelming evidence on that element,[10] trial counsel attempted to mount a challenge to the Commonwealth's evidence on "premeditated malice aforethought," leaving the door open for the jury to find that LaCava's mental condition may have affected his ability to premeditate *or* specifically intend the killing of his wife at the moment he pulled the trigger. At trial, Dr. Krell testified extensively about the nature and origin of LaCava's depression and his personality disorder, and how those conditions, compounded by intense stress and anxiety, would have affected LaCava's ability to think and act deliberately at the moment he perceived a final rejection from his wife. Counsel's closing argument and the jury instructions he requested and received from the judge forcefully conveyed to the jury the claim of diminished capacity offered by LaCava.[11] His efforts, while unavailing, were nevertheless not ineffective.

---

[10]In addition to the evidence discussed above, at trial, on cross-examination by the Commonwealth, Dr. Krell testified that LaCava had made plans to kill his wife prior to the final confrontation.

[11]The judge instructed the jury that they could consider LaCava's mental condition or mental impairment at the time of the killing in determining whether the Commonwealth had proved beyond a reasonable doubt that LaCava acted with premeditation *and* also in determining whether it had met its burden in proving that LaCava had formed a specific intent to kill his wife or inflict grievous harm on her, or had the capacity to realize that his actions created a plain and strong likelihood that death would follow.

c. *Trial counsel's waiver of a "humane practice" instruction.* LaCava contends that trial counsel's decision to refuse the judge's offer to give a "humane practice" instruction was manifestly unreasonable. Our humane practice procedure allows the jury to consider whether out-of-court admissions made by a defendant and introduced at trial were voluntarily made, before considering them as evidence of guilt. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149, cert. denied, 457 U.S. 1137 (1982) (extending humane practice to admissions as well as confessions); *Commonwealth* v. *Harris*, 371 Mass. 462, 469-470 (1976) (issue of voluntariness should be submitted to the jury).

Trial counsel's specific waiver of the instruction was, by his own admission, part of his trial strategy to show that LaCava was acting in a fragmented manner shortly after the killing when he spoke to police in Connecticut, characteristics consistent with his theory of diminished capacity. At the post-trial motion hearing, trial counsel testified that he declined a humane practice instruction because the statements and how they were made fit into the diminished capacity defense, and his "whole theme in that case focused on an individual [who] had gone through some tough times, who had had a series of elements . . . to create this terrible stress in his mind at that moment in time [when] all of those issues came together." The motion judge, having heard counsel's testimony, found that LaCava's statements were important to the theory of the defense, and "allowed defense counsel to portray LaCava as an individual battered by emotional issues and who was, accordingly, acting without deliberation or premeditation."

LaCava cites *Commonwealth* v. *Sheriff*, 425 Mass. 186 (1997), to support his claim that even if trial counsel's defense strategy was consistent with leaving the voluntariness of LaCava's admissions unchallenged, a humane practice instruction was still required. The *Sheriff* case is inapposite. In that case, the defendant denied making, or was unable to remember making, the incriminating statements. *Id.* at 194-195. Here, LaCava admitted to making them in his own trial testimony. In these circumstances, where trial counsel's decision not to request the "humane practice" instruction was not unreasonable, "it would

be anomalous to require such a submission where it might be contrary to the theory and strategy of the defendant." *Commonwealth* v. *Pratt*, 360 Mass. 708, 714 (1972). In addition, it would have been pointless for counsel to have asked the jury to consider whether the damaging elements of the statements LaCava had made to the Connecticut State police (that he killed his wife and threw the gun away) were voluntary before using them against him, where LaCava took the stand at trial and admitted killing his wife and disposing of the gun. It was not manifestly unreasonable for counsel to make this tactical decision.[12]

d. *Pleading guilty to violating the protective order.* LaCava argues that because his state of mind was an integral part of the defense strategy, to admit to knowingly violating the protective order in the course of the trial was tantamount to an admission that, moments later, LaCava knowingly and intentionally shot his wife. Therefore, he claims it was a manifestly unreasonable tactical decision by his counsel. We disagree.

In his opening statement, trial counsel admitted that LaCava knowingly violated the protective order when he approached his wife on January 3, 1994. LaCava subsequently testified to this same effect, and pleaded guilty to the indictment during the course of trial. Trial counsel testified at the motion hearing that his decision to recommend that LaCava plead guilty was part of an attempt to focus the jury on the important issue of the killing, not on the violation of the protective order. He also testified that his strategy was to argue that while LaCava may have knowingly violated the order (as he had repeatedly done in the past) in an attempt at one last reconciliation with his wife, moments later he was pushed over the edge and lost control when he saw the look of disdain and final rejection on his wife's

---

[12]LaCava suggests that statements he made to friends and neighbors prior to the killing regarding his efforts to obtain a weapon and his intention of killing his wife might also be the proper subject of a humane practice instruction. They are not. Such an instruction applies only to admissions or confessions made after the crime has been committed. See *Commonwealth* v. *Netto, ante* 686, 699-700 (2003) (statement made prior to crime); *Commonwealth* v. *Boateng, ante* 498, 504 (2003) (statements made during criminal episode).

face.[13] This was part of an effort to demonstrate the fragmented
nature of LaCava's mind and the explosive nature of his mental
state in support of a diminished capacity theory that required
reconciling LaCava's ability to operate rationally throughout the
day of the murder with his inability to premeditate or formulate
a specific intent to kill his wife when he confronted her in the
parking lot. The strategy enabled the defense to argue that
LaCava was in control right up until the moment when he pulled
the trigger — in an unpremeditated, unintended, and uncon-
trolled fit of rage.[14] It cannot be said that this strategy was
manifestly unreasonable in the context of the difficult chal-
lenges posed by the evidence in this case.

e. *Trial counsel's failure to present a voluntary manslaughter
defense based on provocation or sudden combat.* In a claim not
raised in his first motion for a new trial, LaCava now contends
that trial counsel was ineffective by not pursuing and arguing an
additional defense theory directed at reducing the degree of the
killing to voluntary manslaughter. Specifically, LaCava points to
his testimony that he only fired at his wife when "she looked at
me with disdain, and then all of a sudden she made a move that
I thought she was going to hit me with the car." He claims that
the movement of his wife in the vehicle constituted adequate
evidence of provocation or sudden combat, negating malice,
and that trial counsel committed a serious error in not making
this argument to the jury.[15]

The judge instructed the jury that a killing committed in the

---

[13]At the motion hearing, trial counsel testified that the guilty plea fit his
diminished capacity attack on LaCava's ability to form the intent to kill,
"[LaCava] knows what he's doing when he goes there to violate the [protec-
tive] order, but he doesn't know what he is doing a second later when he
shoots [the victim]."

[14]During closing argument, counsel stated, "[LaCava] went home . . . put
his affairs in order, wrote out checks to pay bills . . . [w]hen he went over
and stood in front of [the victim], he didn't know what he was going to do
. . . that is when the volcano exploded."

[15]In order to support a provocation theory, there must be "evidence that
would warrant a reasonable doubt that something happened which would have
been likely to produce in an ordinary person such a state of passion, anger,
fear, fright, or nervous excitement as would eclipse his capacity for reflection
or restraint." *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). "Thus,
'[i]f a person kills another in the heat of passion, which is occasioned by
adequate and reasonable provocation, or in sudden combat, then even though

heat of passion prompted by adequate and reasonable provocation or sudden combat was manslaughter, not murder, and that where there is evidence of such provocation in a murder case the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion. We note that trial counsel, in his closing, argued that it was his wife's expression of disdain, of "the one last thing that he loved blowing him off," that triggered or provoked the uncontrollable response of his firing the weapon, and that his actions in that moment were not "premeditated malice aforethought" but manslaughter. The essence of LaCava's argument therefore reduces itself to an argument that his trial counsel should have directed the jury's attention to his testimony about the victim's movement in the vehicle "like she was going to drive the car" to hit him, to bolster the argument that he was provoked or engaged in sudden combat by the victim, such that his acts were in the heat of passion and his crime should be mitigated from murder to manslaughter.

The motion judge found this argument to have been waived by LaCava's failure to raise it in his first motion for a new trial. We consider whether it raises a substantial likelihood of a miscarriage of justice as required by G. L. c. 278, § 33E. *Commonwealth* v. *Randolph*, 438 Mass. 290, 295-296 (2002). Viewed through the lens of this standard, we reject it.

Even though the judge instructed the jury on "heat of passion," occasioned by provocation or sudden combat, as a circumstance that would mitigate murder to manslaughter, the evidence at trial did not warrant the instruction. Looking at the evidence in the light most favorable to the defendant, as we must, *Commonwealth* v. *Maskell*, 403 Mass. 111, 116 (1988), the killing occurred when LaCava confronted his wife, at night, in the parking lot of her apartment complex, in violation of a protective order, with a loaded firearm drawn and ready to fire.

---

that person had an intent to kill, the killing is designated manslaughter and not murder because of the mitigating circumstances.' " *Commonwealth* v. *Whitman*, 430 Mass. 746, 750-751 (2000), quoting *Commonwealth* v. *Acevedo*, 427 Mass 714, 716 (1998).

The purpose of the confrontation, as LaCava explained it, was to see if there was any hope "to save my home, and if there wasn't, I wasn't going to be arrested." It was, as he described it, "killing time," and either he or both of them were going to die if "everything was gone." In these circumstances, LaCava's further testimony that his wife looked at him with "disdain," and "made a move" as though she were going to drive the vehicle toward him, even if fully credited by the jury, would not, as a matter of law, constitute "adequate and reasonable provocation" or "sudden combat" sufficient for an ordinary person to be driven to a state of passion, anger, fear, fright, or nervous excitement so as to eclipse his capacity for reflection or restraint. See *Commonwealth* v. *Bianchi*, 435 Mass. 316, 328-329 (2001).[16]

Having received an instruction to which he was not entitled by the evidence, we do not find a substantial likelihood of a miscarriage of justice in counsel's arguing only that portion of the evidence that was consistent with and supported the rest of his theory of diminished capacity.

f. *Clothing worn by LaCava during trial.* While it is unconstitutional to compel a defendant to stand trial in prison clothing, see *Estelle* v. *Williams*, 425 U.S. 501, 512 (1976); *Commonwealth* v. *Jackson*, 388 Mass. 98, 107-108 (1983) (holding defendant not compelled to wear prison clothing), this is not such a case. LaCava never objected to wearing the clothing provided to him by Bridgewater State Hospital and never sought to retrieve the clothes that he now claims were in his vehicle. The clothes he wore were not even obviously "prison" clothes. They consisted of slacks and a blue pullover shirt with a collar. The testimony is conflicting on whether the shirt bore an identifying mark of Bridgewater State Hospital over the breast pocket. Importantly, both LaCava and Dr. Krell testified that he was being held at Bridgewater State Hospital because of concern regarding his mental stability, a matter central to his defense. Any error regarding LaCava's clothing was harmless, see *Com-*

---

[16]On cross-examination, LaCava admitted that the vehicle never moved toward him.

*monwealth* v. *Jackson, supra* at 108, and surely did not create a substantial likelihood of a miscarriage of justice.[17]

3. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E, and find no other reason to reduce the jury's verdict or order a new trial.

*Judgment affirmed.*

---

[17]We review this claim, which we agree was waived, on the basis of whether it was error that created a substantial likelihood of a miscarriage of justice.