COMMONWEALTH *vs.* CHRISTOPHER CUTTS.

Hampden. December 9, 2004. - August 9, 2005.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Robbery. Burning a Dwelling House. Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Capital case, Assistance of counsel, Motion to suppress, Voluntariness of statement. *Insanity. Evidence,* Insanity, Voluntariness of statement, Prior misconduct, Photograph.

At a murder trial, the defendant's counsel was not ineffective for failing to pursue a defense of lack of criminal responsibility, where counsel effectively investigated the defendant's drug and mental health problems in advance of trial and reasonably relied on his own expert's opinion that the defendant was not suffering from any psychosis on the day of the homicide, and where counsel discussed the decision to forgo an insanity defense with the defendant and the defendant agreed to the strategy [827-829]; likewise, counsel was not ineffective in failing to file a motion to suppress the defendant's statements to the police, where such a motion was unlikely to succeed and where there were strategic reasons for allowing the statements to be admitted in evidence [829-831]; further, counsel was not ineffective in failing to challenge the voluntariness of the defendant's statements to two civilian witnesses, and the judge did not err in not conducting a voir dire examination on his own volition, where evidence of the defendant's intoxication at the time he made the inculpatory statements was at best conflicting, and where the totality of the circumstances supported a conclusion that the defendant, even if intoxicated, was nonetheless rational, and therefore, no substantial claim of involuntariness arose [831-833].

At a murder trial, the defendant's counsel was not ineffective for failing to object to testimony concerning the length and nature of the defendant's prior incarceration, where some of the references were admissible to show motive or as an admission; where another reference could not have been prejudicial to the defendant; where other references, while irrelevant, were not so prejudicial as to create a substantial likelihood of a miscarriage of justice; where the prosecutor's reference in closing argument to the defendant's prior incarceration was made in passing; and where the judge gave a lengthy and explicit admonition in his charge to the jury on the limited use of prior bad acts evidence, including the defendant's prior incarceration [833-835]; likewise, counsel was not ineffective in failing to object to the admission of a certain photograph showing hemorrhages in the victim's eyes, even though the Commonwealth failed specifically to link the hemorrhages in the victim's eyes to the manner and cause of his death, where defense counsel's failure to object did not result in a substantial likelihood of a miscarriage of justice, given that there was no

evidence that the hemorrhaging was caused by anything other than the defendant's assault, the photograph was not particularly gruesome, and the judge cautioned the jury, prior to the admission in evidence of any of the photographs, to view the photographs as evidence and not to be swayed by their emotions [835-836]; further, the cumulative effect of counsel's failure to object to the irrelevant testimony and to the photograph did not require reversal of the defendant's convictions [836].

INDICTMENTS found and returned in the Superior Court Department on April 2, 1998.

The cases were tried before *Daniel A. Ford*, J., and a motion for a new trial, filed on February 8, 2001, was heard by him.

*Leslie W. O'Brien* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

CORDY, J. In 1998, a Hampden County jury convicted Christopher Cutts of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. Cutts was also convicted of armed robbery and arson. On appeal from his convictions and from the denial of his motion for a new trial, Cutts argues that he was deprived of the effective assistance of counsel. Specifically, he contends that his trial counsel (1) failed to pursue a defense of lack of criminal responsibility, (2) failed to file a motion to suppress statements he made to the police, (3) failed to challenge the voluntariness of statements he made to two civilian witnesses, (4) failed to object to testimony concerning the length and nature of his prior incarceration, and (5) failed to object to the introduction of a photograph depicting hemorrhages in the victim's eyes. Finally, he asks us to exercise our power under G. L. c. 278, § 33E, to reduce his conviction to murder in the second degree. After considering Cutts's arguments, and after undertaking a complete review of the trial record pursuant to G. L. c. 278, § 33E, we affirm the judgments of conviction and the order denying the motion for a new trial.

1. *Background.* We recite the facts the jury could have found based on the evidence presented at trial. On March 13, 1998, John C. Gallina was found dead in his Springfield home. His body lay face down on the kitchen floor. His skull was fractured,

a gearshift from a Jaguar automobile protruded from his ear, and a white rope hung around his neck. Fires had been set in the house to cover up the crime, and Gallina's television and stereo were missing.

Cutts and Gallina were part of a circle of friends who routinely gathered at Gallina's house to play cards, watch pornographic movies, and smoke "crack" cocaine. On March 9, 1998, Peter DePergola went to Gallina's house. Cutts was already there. DePergola, Cutts, and Gallina smoked crack cocaine until Gallina went to bed. Sometime between 3 and 4 A.M., DePergola and Cutts left Gallina's house, locking the kitchen door behind them.

On March 13, Timothy McNally, a childhood friend of Gallina, found Gallina's body after he entered Gallina's house through the kitchen door, which was unlocked. Emergency medical personnel and the Springfield police were called and arrived at the scene shortly thereafter. The police observed that a pane of glass in the kitchen door had been broken and there were shards of glass on the floor. A vise and a roll of duct tape were also found on the floor. Duct tape covered two of the pieces of broken glass. Removal of the duct tape revealed fingerprints on the glass, which matched Cutts's fingerprints.[1] Tire impressions detected in front of Gallina's house matched the tires of a motor vehicle registered to Sandra L. Scott, Cutts's mother.[2]

On the same day that Gallina's body was found, Cutts asked his former girl friend, Tina Swolenski (in whose home he was then staying), to telephone Gallina because he had not seen him in a few days and he was concerned about him. Cutts later telephoned Gallina's mother from a public telephone to inquire about her son, and was informed that Gallina was dead. Cutts then told Swolenski that "they would probably blame [Gallina's death] on him because he had done ten years previously and he

---

[1]The fingerprints actually had been placed on the adhesive side of the duct tape and apparently transferred to the glass (albeit reversed) when the tape was applied to it.

[2]An investigator with the State fire marshal's office also discovered evidence of three separate fires in the home, one in the living room and two in the bedroom. He opined that the fires had been intentionally set, likely with a cigarette lighter.

was the last one to leave the house." The next day (March 14), Cutts admitted to Swolenski that he killed Gallina and that "he did it because he killed somebody before and [Gallina] was going to tell on him." He also told Swolenski that he tried to burn Gallina's house down, but that the fire suffocated because he did not open the windows.[3] Swolenski drove Cutts to a branch of his bank so that he could put her name on his bank account, allowing Swolenski to send money to him. Cutts subsequently took Swolenski's motor vehicle and drove to New York City.[4]

In the early morning hours of March 18, three Springfield police officers took Cutts into custody at a police station on Staten Island in New York City.[5] After being informed of his Miranda rights, Cutts telephoned Richard Williams, a friend and former Connecticut State trooper, seeking advice. Cutts then stated that he wanted to talk to the police officers, after which he signed a written statement confessing to the killing of Gallina.

In his written statement, Cutts claimed that he had been incarcerated previously and that on his second day in prison, he had been raped at knife point. A rope had been wrapped around his neck, and three men had raped him for four continuous days. He stated that homosexual activity "makes [him] sick to this day." He also described the events surrounding Gallina's death as follows. On March 9, Cutts and his boss purchased and smoked three rocks of crack cocaine. At approximately 2 P.M. on that day, Cutts's boss dropped Cutts off at Gallina's house, where Cutts smoked crack cocaine with Gallina and other persons until 5 A.M. the following day. Cutts then borrowed his

---

[3]During the same day, Cutts was also in contact with a cousin, Isaiah Weldon. Cutts told Weldon that he had killed someone, repeated the phrase, "murder one," and then he said that he had "been through this stuff before."

[4]Before he left for New York City, Swolenski took Cutts to the house of another former girl friend, Louise Carlson. Cutts told Carlson "that something had happened" and "that he was going to be leaving for awhile." Sometime after Cutts left Carlson's house, he telephoned her and asked her to call the police from a public telephone and tell them (falsely) that he was in New Hampshire and would be returning to Springfield by bus.

[5]After Cutts left for New York City, Swolenski contacted the Springfield police department. On March 17, members of the Springfield police were informed by New York City authorities that Cutts had been found on Staten Island.

mother's motor vehicle and purchased three more rocks of crack cocaine, which he smoked by himself. Thereafter, he telephoned Gallina and asked him to contact a "weight man," a person who sells larger quantities of crack cocaine. Cutts drove to Gallina's house and together they proceeded to purchase an additional one-half ounce of cocaine. They returned to Gallina's house where they finished the cocaine. At around 10 P.M. (on March 10), Cutts asked Gallina to contact the weight man again. Before they "went on the second run," Gallina suggested that they engage in a sexual act. Cutts knew that Gallina was homosexual, but did not think that he "would cross that line." Cutts ignored Gallina's suggestion and got up to change the radio station. Gallina proceeded to make sexual advances toward Cutts, touching him on the buttocks and in the groin area. Gallina turned his back and Cutts picked up a white rope on the floor. Cutts was experiencing "a flashback about prison and about when [he] was raped." He wrapped the rope around Gallina's neck, brought him to the ground, and struck him in the head twice with a vise that was on the counter.[6] Cutts then walked into the living room and retrieved a gearshift from a table. He pushed the gearshift into Gallina's ear.[7] Cutts removed Gallina's television and stereo from the house, started fires in the living room and the bedroom with "the torch [they] smoked the coke with," and used a screwdriver to "make it look like a forced entry." Cutts subsequently sold the television and stereo equipment for sixty dollars in cash and several rocks of crack cocaine. Cutts told the police that he had been addicted to crack cocaine since February, 1995, and that the drug "destroyed [him] mentally, physically, and spiritually."

[6]The medical examiner who conducted the autopsy of Gallina's body testified that the cause of death was blunt head trauma, consistent with two or more blows to the head from the vise found at the crime scene. Gallina sustained four scalp lacerations, a depressed skull fracture, a "dumbbell shaped" fracture on the left side of his head, additional fractures located on the floor of his skull, and contusions of the brain. The medical examiner also observed an abrasion on the back of Gallina's neck, which could have been caused by a rope, and cuts just above his Adam's apple, which could have been caused by glass or jewelry. Hemorrhages were visible across Gallina's forehead and in the whites of his eyes.

[7]The medical examiner testified that the gearshift penetrated Gallina's left ear, traveled through his ear canal, and extended across to the right side of Gallina's neck.

At trial, Cutts pursued a claim of "diminished capacity," contending that his actions were the result of "homosexual panic," a recognized psychological condition, exacerbated by a flawed character structure and the ingestion of cocaine. In combination, Cutts argued, these factors negated the elements of intent and premeditation necessary for a conviction of murder in the first degree. See *Commonwealth* v. *LaCava*, 438 Mass. 708, 716-718 (2003), and cases cited. He called four witnesses on his behalf. Josephine Veto, a former girl friend, testified that in February, 1998, Cutts told her that he had been raped in prison. Greg Brewer, who bought Gallina's stereo from Cutts the night of the murder, testified that Cutts was "real high" on crack cocaine that evening. Two experts also testified for the defense: Gerald Kochansky, a clinical psychologist, and Thomas Gutheil, a forensic psychiatrist.

Dr. Kochansky testified that at the request of Dr. Gutheil, he had administered two days of standardized psychological tests to Cutts. On the basis of those tests, he concluded that Cutts was suffering from borderline personality disorder, with psychopathic narcissistic and antisocial features. He further opined that Cutts killed Gallina in a "homosexual panic," "an intense state of anxiety and fear in the face of what is experienced as . . . the threat of a homosexual attack." He also testified that the use of cocaine "would intensify [Cutts's] vigilant and paranoid stance, and it would have a disinhibiting effect on his impulse control." On cross-examination, Dr. Kochansky admitted that Cutts's mental disorders did not adversely affect his ability to appreciate the wrongfulness of his actions.

Dr. Gutheil arrived at a similar diagnosis: antisocial personality disorder with elements of grandiosity. He testified that "homosexual panic" is a condition of paranoia that would be intensified by crack cocaine. He opined that whether Gallina was in fact homosexual was irrelevant; rather, individuals such as Cutts "can get into a situation where they are frightened by anything that even resembles a push for intimacy by someone making an advance to them." In sum, his opinion was that Cutts's conduct was a frenzied and unanticipated response to a sexual advance or perceived sexual advance by Gallina. On

cross-examination, Dr. Gutheil testified that he did not know whether cocaine ingestion alone, in the absence of a sexual advance, would have impaired Cutts's ability to distinguish right from wrong.

In rebuttal, the Commonwealth's expert psychiatrist, Martin Kelly, testified that Cutts had an antisocial personality disorder, but no mental disease or defect that affected his capacity to form the specific intent to kill or do grievous bodily injury.

The jury convicted Cutts of murder in the first degree, armed robbery, and arson. He appealed and on February 8, 2001, filed a motion for a new trial. We remanded the motion to the trial judge, who subsequently held an evidentiary hearing, limited to the issue whether defense counsel provided ineffective assistance by failing to advance a defense of lack of criminal responsibility. The judge concluded that Cutts was not deprived of the effective assistance of counsel and rejected the remainder of Cutts's claims.

2. *Discussion.* Under G. L. c. 278, § 33E, we begin our evaluation of a claim of ineffective assistance of counsel "by determining whether there was a serious failure by trial counsel. If so, then we determine whether the failure resulted in a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Harbin*, 435 Mass. 654, 656 (2002). "As to claimed errors in trial counsel's strategy, none is established unless we are persuaded that counsel's tactics were ' "manifestly unreasonable" when undertaken.' " *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 98 (2004), quoting *Commonwealth* v. *Sielicki*, 391 Mass. 377, 379 (1984). We address each of Cutts's ineffective assistance claims in turn.

a. *Failure to pursue a defense of lack of criminal responsibility.* Relying on *Commonwealth* v. *Herd*, 413 Mass. 834 (1992), Cutts argues that trial counsel should have conferred with an expert in addiction psychiatry prior to trial, and should have advanced an insanity defense based on evidence that Cutts's conduct at the time of the homicide was the result of an unanticipated, cocaine-induced psychotic episode.[8] Cutts as-

---

[8]In *Commonwealth* v. *Herd*, 413 Mass. 834 (1992), we reiterated the principle that "[i]f voluntary consumption of a drug activated a latent mental

serted this same argument in his motion for a new trial. In support of that motion, he provided affidavits from an addiction psychiatrist and from a medical doctor with expertise in cocaine abuse and dependence, neither of whom had conducted an in-person psychiatric evaluation of Cutts. Both physicians opined that on the night in question, Cutts likely suffered from an unanticipated psychotic episode brought on by cocaine exacerbation of an underlying mental disorder, although they could not be reasonably certain of this diagnosis without a personal assessment of Cutts. After an evidentiary hearing, the judge concluded that trial counsel effectively investigated Cutts's drug and mental health problems in advance of trial, and reasonably relied on his own expert's opinion that Cutts was not suffering from any psychosis on the day in question. We agree that in this circumstance, trial counsel was not ineffective.

This is not a case in which trial counsel was on notice of a potential issue of lack of criminal responsibility and failed to investigate the matter. See *Commonwealth* v. *Roberio*, 428 Mass. 278, 279 (1998) (finding ineffective assistance where prior to trial, defense counsel did not explore lack of criminal responsibility defense, chose not to ask defendant to submit to psychiatric testing, and made own determination of defendant's mental health). At an early stage in the proceedings, defense counsel determined that he would explore Cutts's mental health and drug use. Consequently, he retained Dr. Gutheil and provided him with all of the documents produced by the Commonwealth in discovery and the names of several psychopharmacologists. At Dr. Gutheil's request, Cutts underwent a battery of psychological tests. Based on the results from those tests, an in-person examination of Cutts, a conversation with Cutts's mother, and a review of the discovery documents, Dr. Gutheil determined that Cutts did not meet the insanity defense criteria established in *Commonwealth* v. *McHoul*,

---

disease or defect and, as a result of that mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law, lack of criminal responsibility would be established, unless the defendant 'knew or had reason to know that the [drug] would activate the illness.' " *Id.* at 839, quoting *Commonwealth* v. *Brennan*, 399 Mass. 358, 363 (1987).

352 Mass. 544, 546-547 (1967).[9] Rather, Dr. Gutheil concluded that Cutts had "some diminution of his capacity" to appreciate his conduct and to conform his conduct to the requirements of the law. In these circumstances, it was not manifestly unreasonable for trial counsel "to consider [Dr. Gutheil's] opinion as a serious impediment to an insanity defense" and "to focus on the possibility of securing a reduced verdict by presenting a theory of diminished capacity to the jury, a theory that could be conveyed effectively through the testimony of his expert[s]." *Commonwealth* v. *LaCava*, 438 Mass. 708, 714, 715 (2003). Additionally, the judge found that defense counsel's decision to forgo an insanity defense was not a unilateral one. Defense counsel had discussed the decision with Cutts, and Cutts agreed with this strategy. *Id.* at 716 ("[defendant's] informed and voluntary agreement to proceed in accordance with trial counsel's recommendation further undermines [although does not preclude] his ability now to claim that counsel was ineffective for pursuing that strategy at trial").

b. *Failure to file a motion to suppress Cutts's statements to the police.* Cutts next contends that defense counsel provided ineffective assistance by failing to file a motion to suppress statements Cutts made to the police. In the affidavit he filed in support of his motion for a new trial, Cutts stated that he made multiple requests for an attorney after he was brought to the police station on Staten Island, all of which were ignored. He argues that his subsequent interrogation by the Springfield police was therefore in violation of the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, and that his statements should have been the subject of a motion to suppress.

In an affidavit, filed in connection with the motion for a new trial, Cutts's trial counsel stated that he did not move to suppress statements made to the police for two reasons: (1) there

[9]Taken from the American Law Institute's Model Penal Code § 4.01 (Proposed Official Draft 1962), the rule in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), is as follows: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

were no grounds for suppression because Cutts assured trial counsel that he was permitted to telephone counsel (but called former trooper Williams instead) and knowingly and voluntarily waived his Miranda rights[10]; and (2) there were strategic reasons for allowing the statements to be admitted in evidence, namely, admission permitted trial counsel to advance his homosexual panic defense without exposing Cutts to cross-examination. The judge declined Cutts's request to hold an evidentiary hearing on this claim, and concluded on review of trial counsel's affidavit and the Commonwealth's opposition memorandum that there was a "sound tactical basis" for trial counsel's failure to file a suppression motion. We agree.

The judge was not required to conduct an evidentiary hearing on Cutts's claim. " 'The choice of deciding [a motion for a new trial] on the basis of affidavits or hearing oral testimony is left largely to the sound discretion of the judge,' . . . to which appellate courts generally defer." *Commonwealth* v. *Birks*, 435 Mass. 782, 792 (2002), quoting *Fogarty* v. *Commonwealth*, 406 Mass. 103, 110 (1989). As to the substance of Cutts's claim, "in order to prevail on an ineffective assistance of counsel claim on the ground of failing to file a motion to suppress, the defendant has to demonstrate a likelihood that the motion to suppress would have been successful." *Commonwealth* v. *Comita*, 441 Mass. 86, 91 (2004). On the facts of this case, a motion to suppress Cutts's statements to the police would have had only the slightest chance of success. One of the Springfield detectives who traveled to Staten Island to take Cutts into custody during the early morning hours of March 18 testified that Cutts stated that he wanted to speak to police. The officers then supplied Cutts with a form listing his Miranda rights. Cutts read the form aloud, initialed each of the warnings, and signed the form. Cutts was then told that he could use the telephone to contact an attorney or anyone else to whom he wished to speak. Cutts telephoned Richard Williams. The record is devoid of any evidence corroborating Cutts's posttrial assertion that he requested to speak to an attorney and that this request was ignored.

---

[10]Prior to empanelling a jury, the judge inquired of defense counsel whether the voluntariness of Cutts's statement to the police was at issue in the case. Counsel responded definitively and repeatedly that it was not.

Trial counsel also had strategic reasons for not challenging the admissibility of these statements. He and his experts used details from Cutts's statements to the police, namely his allusions to his rape in prison, to his addiction to cocaine, and to Gallina's unsolicited sexual advances, to advance the theory of "diminished capacity." Admission of the statements established this factual groundwork without exposing Cutts to cross-examination.

Cutts argues that a homosexual panic defense could have been advanced solely through the testimony of Dr. Kochansky, and that "Dr. Kochansky could have testified that he determined that Cutts was in a state of homosexual panic at the time of the homicide based on his interview with Cutts and his test results." That interview, however, took place in the middle of July, some four months after the killing. Moreover, only the expert's opinion, and not any of the underlying details of what Cutts might have told him, would have been admissible in the expert's direct testimony. *Department of Youth Servs.* v. *A Juvenile,* 398 Mass. 516, 531-532 (1986). In contrast, Cutts's statement to the police was detailed, consistent with the claim he was asserting at trial, and made within days of the victim's death. Trial counsel reasonably could have concluded that such a statement (in the defendant's own words) would be more persuasive to the jury. In any event, given the unlikelihood of a successful motion to suppress, we cannot conclude that trial counsel's decision represented the kind of "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent." *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978), quoting *Beasley* v. *United States,* 491 F.2d 687, 696 (6th Cir. 1974).

c. *Failure to challenge the voluntariness of Cutts's statements to two civilian witnesses.* Cutts asserts that trial counsel provided ineffective assistance by failing to request voir dire hearings, rulings of law, and jury instructions concerning the voluntariness of statements Cutts made to Tina Swolenski and Isaiah Weldon at a time when, according to Cutts, he was under the influence of crack cocaine. Cutts also contends that even in the absence of a challenge by defense counsel, the judge was obligated to conduct a voir dire examination, to rule on the vol-

untariness of the statements, and to submit the issue to the jury. We conclude that both trial counsel and the judge acted properly.

"[A]n admission, whether made to police or to a civilian, is admissible only if it is voluntarily made." *Commonwealth* v. *Sheriff*, 425 Mass. 186, 192 (1997), citing *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991), and *Commonwealth* v. *Allen*, 395 Mass. 448, 456 (1985). "But the question of voluntariness must be raised by a defendant, and he must offer some proof to support his claim." *Commonwealth* v. *Smith*, 426 Mass. 76, 82 (1997). Moreover, a defendant may make a reasonable tactical decision not to request a voir dire even when there is evidence of involuntariness. *Commonwealth* v. *Serino*, 436 Mass. 408, 413-414 (2002). In the absence of such a request, the judge still must conduct a voir dire if evidence of a "substantial claim of involuntariness" arises at trial. *Commonwealth* v. *Brady*, 380 Mass. 44, 49 (1980), quoting *Commonwealth* v. *Harris*, 371 Mass. 462, 470 (1976).

Although "[s]tatements that are attributable in large measure to . . . drug abuse . . . are involuntary," *Commonwealth* v. *Allen, supra* at 455, and cases cited, "[i]ntoxication alone is not sufficient to negate an otherwise voluntary act." *Commonwealth* v. *Doucette*, 391 Mass. 443, 448 (1984). Here, evidence of Cutts's intoxication at the time he made inculpatory statements to Swolenski and Weldon on March 14 was at best conflicting. On that day, Swolenski drove Cutts to Weldon's house and waited for him while he spoke to Weldon. Cutts returned to the vehicle with crack cocaine. Swolenski testified, however, that Cutts did not smoke the crack cocaine until after he admitted to her that he killed Gallina, and after she drove him to the bank so that he could change the name on his bank account. Weldon, on the other hand, testified that Cutts appeared to be high on cocaine when Cutts told him that he had killed somebody and repeated the phrase, "murder one." While the jury could have concluded that Cutts was intoxicated at the time he made these incriminating statements to Swolenski and Weldon, the totality of the circumstances supports a conclusion that Cutts was nonetheless rational. *Commonwealth* v. *Lanoue*, 392 Mass. 583, 587 (1984), *S.C.*, 400 Mass. 1007 (1987), and 409 Mass. 1 (1990) ("In determining voluntariness, we must examine the

totality of the circumstances"). Cutts had no trouble conversing coherently with either Swolenski or Weldon, *Commonwealth* v. *Smith, supra* at 81-82, and, perhaps more importantly, he exhibited the presence of mind to plan for his flight to New York by changing the name on his bank account and by taking Swolenski's motor vehicle. On this record, it would have been extraordinary for any fact finder to have concluded that Cutts's statements were anything other than "the product of a rational intellect and a free will." *Blackburn* v. *Alabama*, 361 U.S. 199, 208 (1960).[11] Trial counsel was not ineffective in failing to request a voir dire examination, rulings of law, or jury instructions concerning the voluntariness of those statements. Further, because no "substantial claim of involuntariness" arose during the trial, the judge did not err in failing to act sua sponte.

d. *Failure to object to testimony concerning the length and nature of Cutts's prior incarceration.* Although Cutts concedes that evidence of his rape in prison was necessary to his defense, he contends that trial counsel erred in failing to object to the following testimony concerning the length and nature of his prior incarceration: (1) Swolenski's testimony that Cutts told her that he killed Gallina "because he killed somebody before and [Gallina] was going to tell on him"; (2) Weldon's testimony that Cutts repeated the phrase "murder one" and told Weldon that he had "been through this stuff before"; (3) Louise Carlson's testimony that she had had a romantic relationship with Cutts while he was an inmate; (4) Swolenski's testimony that Cutts told her "he had done ten years previously"; and (5) police testimony concerning Cutts's statement to the Springfield police, in which Cutts stated that he had been sentenced to State prison for ten to fifteen years. Cutts also argues that defense counsel erred in eliciting certain testimony from his own witness, Dr. Gutheil. Dr. Gutheil testified on direct examination that Cutts told him that he had been in prison between 1986 and 1994 on a charge of attempted murder. Cutts argues that these errors were compounded by the judge's failure

---

[11]In his affidavit, trial counsel states that Cutts told him that his statements to Swolenski and Weldon were voluntary and part of a conscious effort to manipulate them into assisting him to gather "money, clothing, drugs and a vehicle in which to leave town."

to give a contemporaneous limiting instruction on the use of evidence of prior bad acts, and by the prosecutor's closing argument, in which she stated, "Well, ladies and gentlemen, he may have been raped in prison. He was in jail a long time."

It is well settled that "[e]vidence of prior bad acts may not be offered to prove bad character." *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 370 (1997), and cases cited. Such evidence, however, may be used "to show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Swolenski's testimony that Cutts told her that he killed Gallina "because he killed somebody before and [Gallina] was going to tell on him" was admissible to show motive to kill Gallina.[12] The prosecutor did not linger on this part of Swolenski's testimony. In these circumstances, defense counsel's decision not to object to Swolenski's testimony and risk drawing the jury's attention to Cutts's statement that "he [had] killed somebody before" was reasonable.

Weldon's testimony that Cutts stated "murder one, murder one" and told Weldon that he had "been through this stuff before" was also admissible as an admission. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.8.1, at 496 (7th ed. 1999) ("Any extrajudicial statement by a party may be admitted in evidence against that party by an opponent, and will not be excluded on the ground it constitutes hearsay"). "An admission in a criminal case is a statement by the accused . . . of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to establish his guilt." *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990), quoting *Commonwealth* v. *Bonomi*, 335 Mass. 327, 347 (1957).

Carlson's testimony that she had had a romantic relationship with Cutts while he was an inmate could not have been prejudicial to Cutts, as he concedes that the jury would have to

---

[12]Cutts argues that Swolenski only should have been permitted to testify that Cutts feared that Gallina "was going to tell on him" in regard to some unspecified crime. The admission of the first part of Cutts's statement, however, is necessary to understand the depth of Cutts's motivation for the killing. Accordingly, it was well within the judge's discretion to admit it.

have believed that he had been incarcerated to adopt his theory of the case. We also conclude that the testimony from Swolenski, the police, and Dr. Gutheil concerning the length of Cutts's prior incarceration, and Dr. Gutheil's testimony concerning the nature of that incarceration, while irrelevant, were not so prejudicial as to create a substantial likelihood of a miscarriage of justice. The reference to Cutts's prior incarceration by the prosecutor in closing argument was made in passing and adds no cognizable fuel to this modest fire. There was abundant evidence of Cutts's guilt, including his own detailed confession. Moreover, although defense counsel did not request a limiting instruction at the time the evidence was admitted, the judge gave a lengthy and explicit admonition in his charge to the jury on the limited use of prior bad acts evidence, including Cutts's prior incarceration. See *Commonwealth* v. *Marshall*, 434 Mass. 358, 367 (2001), citing *Commonwealth* v. *Ferguson*, 365 Mass. 1, 11 (1974) (timing of limiting instruction within judge's discretion).

e. *Failure to object to the admission of the photograph.* Cutts bases his final ineffective assistance claim on defense counsel's failure to object to the admission of a photograph depicting hemorrhages in Gallina's eyes. In the photograph, the medical examiner is shown opening Gallina's eyelids to reveal hemorrhaging in the outer aspect of the whites of each eye. Cutts argues that because the Commonwealth offered no testimony concerning the cause, timing, or significance of the hemorrhages, the photograph was not relevant.

While we agree that the Commonwealth failed specifically to link the hemorrhages in Gallina's eyes to the manner and cause of his death and that trial counsel therefore might have successfully objected to admission of the photograph, we conclude that his failure to do so did not result in a substantial likelihood of a miscarriage of justice. "This court has almost never ruled that it was error to admit photographs of crime scenes and homicide victims." *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 362 (2000), quoting *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999). Cutts's reliance on *Commonwealth* v. *Richmond*, 371 Mass. 563 (1976), in which we reversed the defendant's murder and rape convictions because of the introduction in

evidence of certain photographs, is misplaced. In that case, the challenged photographs depicted gruesome postmortem injuries that were not the result of the assault on the victim. *Id.* at 564. Here, there is no evidence that the hemorrhaging was caused by anything other than Cutts's assault, and "[g]iven the disturbing nature of the case," the photograph is "not particularly gruesome," *Commonwealth* v. *Vizcarrondo, supra* at 363. Indeed, the photograph is far less gruesome than the other photographs of the victim's injuries that were properly admitted in evidence. Finally, prior to the admission in evidence of any of the photographs, the judge cautioned the jury "to simply view the photographs as a piece of evidence and not allow [themselves] to be carried away or swayed by [their] human emotions in viewing [them]." *Commonwealth* v. *DeSouza, supra* at 670 ("A judge may appropriately attempt to mitigate the potentially prejudicial nature of a photograph by instructing the jury that the photograph is to be used in analyzing the evidence and is not designed to elicit sympathy").

f. *The cumulative effect of the asserted errors.* Last, Cutts contends that even if the asserted failures of defense counsel do not warrant reversal of Cutts's convictions when considered independently, their combined effect nonetheless gives rise to a substantial risk of a miscarriage of justice. We reject this argument. Although defense counsel failed to object to testimony concerning the length and nature of Cutts's prior incarceration and to a photograph depicting hemorrhages in the victim's eyes, these omissions, viewed individually or in sum, do not require reversal of Cutts's convictions.

3. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record as required by G. L. c. 278, § 33E, and find no other reason to reduce the jury's murder verdict or order a new trial.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*