COMMONWEALTH *vs*. REGINALD A. HERD.

Suffolk. September 9, 1992. - December 18, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Insanity. Intoxication. Practice, Criminal,* Instructions to jury.

A criminal defendant was entitled to a jury instruction on lack of criminal
responsibility based on *Commonwealth v. McHoul*, 352 Mass. 544
(1967), where the defendant's cocaine-induced paranoid psychosis, al-
though temporary, was a condition not limited to periods when the de-
fendant was intoxicated by the drug. [838-841]

At a murder trial the judge's instructions to the jury on criminal responsi-
bility were correct statements of the law under *Commonwealth v.
McHoul*, 352 Mass. 544 (1967), and *Commonwealth v. Brennan*, 399
Mass. 358 (1987) [841-842], and there was no risk of a miscarriage of
justice with respect to his supplemental instructions on the same issue
[842-844].

INDICTMENT found and returned in the Superior Court De-
partment on July 14, 1988.

The case was tried before *Robert A. Mulligan*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Carol A. Donovan*, Committee for Public Counsel Ser-
vices, for the defendant.

*Roger L. Michel, Jr.*, Assistant District Attorney, for the
Commonwealth.

WILKINS, J. On May 12, 1988, the defendant killed three
year old Melvyn McKiver. A medical examiner testified that
Melvyn received at least 277 blunt force injuries from whip-
pings to most of his body and blows to his head and that
Melvyn died from bleeding around and swelling of his brain.
A jury returned a verdict of guilty of manslaughter on an
indictment charging him with murder in the first degree. The
defendant appeals challenging, in various respects, the

judge's jury instructions on the issue of the defendant's criminal responsibility. We transferred the defendant's appeal here on our own motion. We affirm the conviction.

Melvyn McKiver was the son of Rhonda Barnes and one Marshall McKiver whom Barnes had divorced the year after Melvyn's birth. In early May, 1988, Barnes, who was pregnant with the defendant's child, came to Boston from Pittsburgh with Melvyn to visit the defendant at his apartment. We need not recite the details of the events that led to the defendant's beating of Melvyn. The defendant, a cocaine user, told Barnes that she should discipline Melvyn. The defendant beat Melvyn on May 12, 1988, with an electrical cord while Barnes was in another room. Barnes called for emergency assistance. When fire fighters arrived, Melvyn had no pulse.

The defendant told one fire fighter who responded to the emergency call that he had beaten the child and that he would get that way every time he smoked cocaine. He pointed to a cord and said that he had beaten the child with it. To another fire fighter the defendant said repeatedly that he did not mean to beat the baby. He also said that he was not a child beater and that he realized that beating a child was not proper.

The defendant asserts that the judge's instructions to the jury on the issue of the defendant's lack of criminal responsibility were prejudicially erroneous. We shall ultimately deal with these assertions, but first we must consider the Commonwealth's claim that, on the facts of this case, the defendant was not entitled to assert an insanity defense and hence the defendant was not entitled to any jury instructions concerning his lack of criminal responsibility. See *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). In brief, the Commonwealth contends that the defendant's mental condition shown by the evidence most favorable to the defendant was not a mental disease or defect that qualifies for an insanity instruction. In order to assess this contention, we summarize at some length, but not in full detail, the evidence that the defendant argues required a *McHoul* instruction.

Dr. Ronald K. Siegel, a psychopharmacologist with substantial credentials,[1] testified for the defendant. Dr. Siegel has conducted numerous research studies of the effects of the consumption of cocaine, on both humans and nonhumans. Cocaine is a stimulant that excites the electrical activity in the brain and arouses behavior. Smoking cocaine produces a more tenacious dependency than that produced by other ways of consuming it. Initially, the effects of cocaine consumption are stimulation, euphoria, and excitement. Repeated use leads to a second stage, called dysphoria, in which there is sadness and depression. To overcome this state, the user repeats the use and may catapult into a third stage, paranoia. Such a user becomes suspicious and distrustful of people, usually people close to the user. Long-term use causes irritability, argumentativeness, and verbal if not physical violence. Cocaine can cause hallucinations (false perceptions): seeing, feeling, hearing, or smelling things that are not there.

The most common cocaine hallucination is a tactile one, a belief that there are bugs (or some other animal) on, in, or under one's skin. The afflicted user may scrape at or try to catch the bugs. Cocaine hallucinations occur when the user is wide awake and alert. Thus the user is particularly apt to be convinced that they are real because the hallucinations are so clear and intense. Hallucinations are generally a function of

---

[1] Dr. Siegel has a Ph.D. in psychology and completed a post-doctoral program in psychopharmacology. He defined a psychopharmacologist as one who studies the effects of drugs on behavior and the problems of drug abuse in society. Psychopharmacologists are also involved in the diagnosis and treatment of drug-related disorders. He has taught at various universities, conducted research projects, and written extensively. He has served as a consultant to various entities, including the United States Drug Enforcement Administration and the World Health Organization's advisory committee on cocaine problems. Dr. Siegel has testified in forty-seven States, equally often for the prosecution and the defense.

He has done studies with cocaine hallucinations, examining patients and working with them. He has written several dozen articles on cocaine and studied cocaine problems in Colombia, Ecuador, and Peru. He began studying the phenomena of cocaine smoking (otherwise known, he said, "as using crack or free base or rock cocaine") in 1970.

acute intoxication, but delusions (false beliefs) can persist beyond the acute stage of intoxication.

A further stage of cocaine use evolves from cocaine paranoia into a state of cocaine paranoid psychosis. There are features that are unique to this form of paranoid psychosis, such as the cocaine bugs. This condition can last for months and even years after the last use of cocaine.

Dr. Siegel testified that, in his opinion, on May 12, 1988, the defendant was suffering from a mental disease or defect, a cocaine paranoid psychosis. He based his opinion in part on the defendant's recitation of his history of cocaine use and of his reaction to it. Among the defendant's reactions was seeing worms on his body which on occasion he tried to burn off his forearms and hands. He suspected that there were midgets living under his furniture. He tried to videotape the midgets. He heard voices which he tried to tape-record. He believed the government was conspiring against him. The defendant told Dr. Siegel that he had seen worms and other creatures on Rhonda Barnes and on Melvyn and had tried to burn the worms off them as well. He often beat at the worms with sticks and other items for periods of thirty minutes to two hours without being aware of the time passing. All these delusions increased for the worse as the defendant's cocaine use continued. In Dr. Siegel's opinion, the defendant did not have the capacity on May 12 to appreciate the wrongfulness of his conduct because he believed that he was striking at worms on a piece of skin and not that he was striking the child. Dr. Siegel also testified that in his opinion the defendant lacked the substantial capacity to conform his conduct to the requirements of law because of his nonthinking, repetitive motor movement.

The defendant, according to Dr. Siegel, did not realize that his consumption of cocaine was causing him to be psychotic. He was, however, aware that, when he took cocaine, he beat Rhonda Barnes to remove the worms from her.

The defendant's mother and his wife both testified for the defense. The defendant had told his mother that he had seen

bugs and that a doctor had told him that they do exist. He told her also that there were snakes in a tree in front of his house. His wife, Denise Herd, testified that the defendant had used cocaine from 1985 to 1988. He told her that he saw bugs crawling on the floor and on his body, saw snakes in trees, and heard voices. He tried to videotape the snakes. She saw no snakes on the videotape, but he pointed out to her each one he saw on the videotape. He denied to his wife that his cocaine consumption caused him to see and hear the things he told her about. Another witness testified that the defendant described the bugs and snakes as looking like tadpoles and that he tried to burn them and beat them. The defendant, he testified, expressed a belief in the existence of these creatures even when not "high" on cocaine.

A younger brother of the defendant testified that, on several occasions in 1988, the defendant had said that there were little people in his home. The defendant told him on various occasions that there were worms in the floor, in bookshelves, and on him. The defendant searched for the worms with a flashlight and a blowtorch. The defendant had run through a plate glass door trying to get away from the bugs.

Rhonda Barnes testified on cross-examination that in the year before May 11, 1988, the defendant had accused her of plotting against him, had heard things that were not there, and had said that he saw little people and bugs that attacked him. He tried to brush bugs off her and Melvyn as well as himself. He imagined that there were snakes in a tree in front of the house. He said it was crazy not to believe in them. On the morning of May 12, 1988, he appeared the way he usually did when he had been free-basing cocaine. He was, she said, very paranoid.

1. The defendant was entitled to an instruction concerning lack of criminal responsibility based on the test adopted in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).[2] On the evidence most favorable to the defendant,

---

[2]The rule in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967), taken from the American Law Institute's Model Penal Code § 4.01, at 66 (Pro-

the defendant's mental disease or defect was one that required the giving of an insanity instruction.

We start with some basic principles. Drug addiction resulting from voluntary consumption does not qualify as a mental disease or defect under the *McHoul* test. See *Commonwealth v. Sheehan*, 376 Mass. 765, 767, 771 (1978); *Commonwealth v. McGrath*, 358 Mass. 314, 320 (1970). Nor does alcoholism qualify. See *Osborne v. Commonwealth*, 378 Mass. 104, 111 (1979). If voluntary consumption of a drug activated a latent mental disease or defect and, as a result of that mental disease or defect, the defendant lost the substantial capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law, lack of criminal responsibility would be established, unless the defendant "knew or had reason to know that the [drug] would activate the illness." *Commonwealth v. Brennan*, 399 Mass. 358, 363 (1987). See *Commonwealth v. Shelley*, 381 Mass. 340, 350 (1980).

The Commonwealth argues first that, because the defendant's cocaine-induced paranoid psychosis disappeared within months of his last ingestion of drugs, his mental disease or defect lacked a settled and permanent nature and that, therefore, we should not accept the psychosis as a disease or defect that qualifies for application of the *McHoul* test. If, as here, the disease or defect is recognized medically and existed at the time of the killing independent of any temporary intoxication or "high" that the drug caused, it is not significant that the mental disease or defect was not permanent, provided that it lasted for a substantial time after the intoxicating effects of the drug had worn off. Here the defendant's psychosis existed for a substantial period after the termination of any immediate effects of his cocaine consumption. It

posed Official Draft 1962), is as follows: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth v. McHoul, supra* at 546-547. See *Commonwealth v. Sheehan*, 376 Mass. 765, 766 n.1 (1978).

Commonwealth *v.* Herd.

has been held, we think correctly, that a mental disease caused by drug abuse, even if temporary in nature, may nevertheless be legal insanity if the condition was not limited to periods of the defendant's intoxication. See *People v. Kelly*, 10 Cal. 3d 565, 577 (1973) (insanity need not be permanent to establish defense; temporary psychosis not limited to periods of intoxication can constitute settled condition of insanity); *Porreca v. State*, 49 Md. App. 522, 528-529 (1981) (same); *People v. Conrad*, 148 Mich. App. 433, 441 (1986) (same). Cf. *People v. Skinner*, 185 Cal. App. 3d 1050, 1062-1063 (1986) (toxic cocaine psychosis lasting five to eight days after ingestion of drug, temporary mental condition that does not qualify for insanity defense).

Next, the Commonwealth argues that the defendant's mental disease or defect should not be recognized for the purposes of the *McHoul* test because his condition was the natural and inevitable result of illegal drug use. In *Commonwealth v. Sheehan, supra* at 772, we rejected "the normal consequences of the consumption of drugs as a basis for a claim of lack of criminal responsibility." We were referring to the intoxicating effects of the consumption of drugs, and did not purport to answer the question whether, if a mental disease or defect is caused solely by consumption of a drug, that condition qualifies for application of the *McHoul* test.

The weight of authority in this country recognizes an insanity defense that is based on a mental disease or defect produced by long-term substance abuse.[3] We see no logical reason for rejecting a drug-induced mental disease or defect as a basis for the application of the *McHoul* test simply because the disease or defect is caused only by the drug inges-

---

[3]See, e.g., *People v. Kelly*, 10 Cal. 3d 565, 575-577 (1973); *People v. Free*, 94 Ill. 2d 378, 408, cert. denied, 464 U.S. 865 (1983); *Jackson v. State*, 273 Ind. 49, 52 (1980); *Porreca v. State*, 49 Md. App. 522, 528-529 (1981); *State v. Maik*, 60 N.J. 203, 215 (1972), overruled in part on other grounds, *State v. Krol*, 68 N.J. 236, 265 (1975); *Jones v. State*, 648 P.2d 1251, 1254 (Okla. Crim. App. 1982), cert. denied, 459 U.S. 1155 (1983); *State v. Hartfield*, 300 S.C. 469, 473 (1990). Contra *Evans v. State*, 645 P.2d 155, 160 (Alaska 1982); *Commonwealth v. Henry*, 524 Pa. 135, 149 (1990), cert. denied, 499 U.S. 931 (1991).

tion. We are unwilling, in order to justify a homicide conviction, to permit the moral fault inherent in the unlawful consumption of drugs to substitute for the moral fault that is absent in one who lacks criminal responsibility.

The defendant was entitled to an instruction on criminal responsibility. We turn now to the defendant's challenges to what the judge told the jury.

2. The judge's jury instructions on criminal responsibility were correct statements of the law. There was no reversible error.

The judge carefully gave an instruction based on the *McHoul* test. He then told the jury that, if the Commonwealth proved "beyond a reasonable doubt that the defendant knew or had reason to know that consumption of drugs would activate a mental disease or defect, then you must find that he was criminally responsible for his actions." The judge added that what the defendant had reason to know was to be determined "in the circumstances known to him."

a. The defendant challenges the giving of this instruction on the ground that his mental disease or defect existed when he was not intoxicated and, therefore, the reference to any knowledge he had (or, in his circumstances, should have had) about the effects of his consumption of cocaine on his mental condition had no bearing on the facts of this case. The principle that a defendant who knows or should subjectively know that his consumption of drugs would or might activate a mental disease may not rely on that disease or defect to assert a lack of criminal responsibility was adopted in *Commonwealth* v. *Brennan, supra* at 363. In the *Brennan* case, there was evidence offered that tended to show that the defendant's consumption of alcohol triggered reactions because of a latent mental disease or defect that was separate from the defendant's alcoholism. *Id.* at 359-361.

The judge's instruction was appropriate because, although the evidence was ambiguous as to whether the defendant was in a state of cocaine intoxication at the time of the killing, there was evidence from which the jury could have concluded beyond a reasonable doubt that, quite apart from any mental

disease or defect caused by long-term cocaine consumption, the defendant was "high" on cocaine at the time of the killing and knew that his cocaine consumption would or might cause him to beat someone. The defendant's expert testified that the defendant had said that he knew that, when he used cocaine, he engaged in beatings. The defendant also told a fire fighter at the crime scene that he beat people every time he smoked cocaine. It does not matter whether the mental disease or defect is latent until triggered, as in the *Brennan* case, or, as here, manifests itself from time to time independently of drug consumption. The fact that the defendant had delusions even when he was not "high" on cocaine does not make the instruction inappropriate. It is not necessary that the defendant have known or have reason to know that he had a mental disease or defect as such as long as he knew that his intoxication from his voluntary consumption of cocaine caused or might cause him to beat someone. Thus, just as we indicated in the *Brennan* case (*Commonwealth* v. *Brennan, supra* at 363), proof beyond a reasonable doubt that the defendant knew that his drug consumption would trigger inappropriate conduct in response to a mental disease or defect would deny him an insanity defense.

b. The defendant further challenges the reference in the judge's charge to what the defendant had reason to know about the possible consequences of his drug consumption. As we have just stated, this subjective standard of what the defendant knew or should have known, based on the circumstances known to him, was announced in the *Brennan* case. The defendant did not request the judge to explain this subjective test further in order to keep the jury (a) from using an objectively reasonable person standard or (b) from disregarding any mental condition of the defendant that might have interfered with his ability to understand what a normal person would have reasonably understood. The instruction, as far as it went, was correct on this point.

c. We come now to what the judge additionally instructed the jury on the subject of criminal responsibility. After the jury had been deliberating for several hours and had received

further instructions in response to questions on other aspects of the case, they asked questions about what the judge had told them concerning the lack of criminal responsibility. In the course of giving additional instructions, the judge said in part that "a lack of criminal responsibility is not warranted where the Commonwealth proves beyond a reasonable doubt that the defendant knew or had reason to know that his voluntary consumption of drugs would . . . cause, ab initio, that disease or defect." Defense counsel did not object to the instruction and, in fact, appears to have accepted it because he suggested that a juror seemed not to understand the words "ab initio." The judge told the jury that it meant "from the beginning." This was the first time that the judge had used the words "ab initio" in charging the jury.[4]

The defendant now objects to the portion of the charge just quoted, arguing that there was no evidence that would have warranted a finding that, from the beginning of his cocaine consumption, the defendant knew, or should have known based on his circumstances, that his drug use would cause him to have a mental disease or defect. The further instruction is a correct statement of the law because one who starts taking a drug or continues using it, knowing that it will or might arouse symptoms of a mental disease or defect, is not entitled to an insanity defense based on that mental disease or defect. There was, however, no evidence that the defendant knew or had reason to know of the possibility at the beginning, that is, when he started using cocaine in 1985, that he would or might induce a mental disease or defect. Thus, the instruction insofar as it concerned the defendant's decision to start taking cocaine in 1985 stated a principle of law that had no application to the case. As to the period after the defendant commenced using cocaine, the instruction was correct because there was evidence that, notwithstanding any mental disease or defect, the defendant knew that his cocaine intoxication caused him to beat people. We see no

---

[4]Other portions of the judge's further instructions are not challenged (beyond the objections we have already discussed).

risk of a miscarriage of justice in the giving of this instruction.

*Judgment affirmed.*