## Commonwealth vs. Timothy Whitman.

Essex. November 6, 2008. - March 6, 2009.

Present: Marshall, C.J., Ireland, Cowin, Cordy, & Botsford, JJ.

*Evidence,* Hearsay, State of mind, Cumulative evidence, Rebuttal, Motive. *Mental Impairment. Intoxication. Practice, Criminal,* Hearsay, State of mind, Argument by prosecutor, Instructions to jury, Capital case. *Homicide.*

At a murder trial in which the defendant raised the defense of lack of criminal responsibility, the judge did not err in excluding the testimony of two friends of the defendant, who would have testified that the defendant had told them that he had heard voices in the past, where the statements did not qualify as statements of the defendant's present state of mind or, in the circumstances, as admissible rebuttal evidence. [342-343]

At a murder trial, portions of the prosecutor's closing argument regarding the defendant's motive were permissible, where they were supported by the evidence or reflected reasonable inferences drawn therefrom, and where the prosecutor was entitled to respond to defense counsel's forceful argument that lack of motive in the case supported the defense theory that the defendant suffered mental illness [343-346]; further, statements by the prosecutor that appeared to comment directly on the defendant's right to remain silent, viewed in the context of the closing as a whole and the judge's instructions, did not create a substantial risk of a miscarriage of justice, where the prosecutor was entitled to comment on the defendant's statement to police and omissions therefrom (i.e., that the defendant did not state a reason for stabbing the victims) to meet defense counsel's argument that the lack of motive evidence supported a theory of lack of criminal responsibility [346-348].

A criminal defendant failed to demonstrate that the trial court judge's instruction to the jury regarding the role of voluntary intoxication in determining criminal responsibility was incomplete because it did not contain language indicating that alcohol consumption could have triggered the defendant's mental illness, as such language was not warranted by the evidence [348-350]; further, the instruction, read in its entirety, correctly relayed that alcoholism resulting from voluntary consumption could not be the basis for concluding that the defendant lacked criminal responsibility, as such a condition did not qualify as a mental disease or defect [350], and a small portion of the charge that was not warranted by the evidence did not create a substantial risk of a miscarriage of justice, where the charge as a whole fairly instructed the jury [350-351].

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree or order a new trial, where, despite the defendant's history of depression, two expert witnesses opined that he was criminally responsible, and where there was evidence to support a finding of premeditation. [351]

INDICTMENTS found and returned in the Superior Court Department on November 14, 2001.

The cases were tried before *Richard E. Welch, III,* J.

*Stephen B. Hrones* (*Michael Tumposky* with him) for the defendant.

*Kenneth E. Steinfield,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning of September 14, 2001, while his friend Matthew Valli slept, the defendant repeatedly stabbed him, killing him, and then, using a different knife, stabbed another friend, Brooke Pelletier, while she slept, injuring her. A jury rejected the defendant's claim that he was not criminally responsible under the standards set forth in *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967), and convicted him of murder in the first degree (of Valli) by reason of deliberate premeditation.[1] In addition, the jury convicted the defendant of armed assault with intent to murder Pelletier and assault and battery of Pelletier by means of a dangerous weapon. Represented by new counsel on appeal, the defendant argues error in the exclusion of evidence, in the prosecutor's closing argument, and in the judge's instructions to the jury. We affirm all of the convictions, and discern no basis to grant relief under G. L. c. 278, § 33E.

*The trial.* Based on the Commonwealth's evidence, the jury could have found the following facts. On September 13, 2001, Valli and Pelletier, who had long known each other and had been dating since the previous April, invited some friends, including the defendant, to see their new apartment in Newburyport. Valli was twenty-one years of age; Pelletier was nineteen years of age; and the defendant was twenty years of age.

Pelletier had been a close friend of the defendant for a couple of years. One or two years before she and Valli began living together, Pelletier had the "beginning of a romantic relationship" with the defendant, which involved some kissing. The romance went no further, and the two remained good friends. The defendant and Valli also were good friends.

---

[1] The Commonwealth had proceeded also under a theory of extreme atrocity or cruelty, which the jury rejected.

Commonwealth *v.* Whitman.

At around 8 P.M. on September 13, the defendant arrived at the victims' apartment with his friend James Arnold. They joined the guests and spent the evening talking, listening to music, and drinking. There were no arguments or disagreements, and everyone at the gathering was "in good spirits." The group engaged in some discussion about the events of September 11, and the defendant expressed concern that his brother, a Marine, would be deployed to Afghanistan.

At about 10:30 P.M., after most of the other guests had left, Arnold decided to leave; the defendant was the only guest remaining. Pelletier invited the defendant to stay the night.

A little later, Valli went to bed. There was no bedroom in the apartment, which was similar to a studio apartment. Pelletier and Valli slept on a mattress in a hallway area; during the day, they propped the mattress up against a hallway wall. That evening, Valli slept on the left edge of the mattress, which was near a wall.

The defendant and Pelletier stayed up and talked. The defendant relayed that he and his girl friend intended to "get their own place." They discussed the recent terrorist attacks, and the defendant became "emotional about his brother."

At 1:30 A.M., September 14, Pelletier went to bed and told the defendant that he could sleep on the mattress with her and Valli. Pelletier positioned herself in the middle of the mattress, and the defendant lay down beside her.

A few minutes later, Valli got up to get some cereal. Five or ten minutes after that, the defendant also arose and left the hallway area. Pelletier moved toward the wall, keeping her left ear on the mattress. Because she had difficulty hearing out of her right ear, sleeping that way helped her sleep better. About ten minutes later, Pelletier had the "sensation" of someone returning to the mattress.

At approximately 3 A.M., the defendant took a large knife from the kitchen, went over to Valli, who was sleeping on the mattress, and stabbed him. Valli stood up and asked, "What's going on?" The defendant threw him against a wall and stabbed him again. The defendant then threw Valli back down on the mattress.[2] Valli suffered multiple stab and incised wounds in the area of his

---

[2]The evidence of what occurred between Valli and the defendant came

left upper arm, back, and chest. One of the stab wounds to Valli's chest penetrated his left lung and heart, and by itself would have been fatal. The knife used by the defendant broke. Valli died as a result of his wounds.

The defendant went into the kitchen area and retrieved a second knife that was shorter and wider, similar to a cleaver. Using this, he attacked Pelletier. Pelletier woke up to find the defendant at the foot of the mattress, stabbing her in the shoulder. She screamed, and the defendant cut her hand as she tried to stand up. Once she stood up, the defendant stopped and retreated to the bathroom. He then left the apartment. Pelletier suffered stab wounds on her face, right hand, shoulder, arm, and back.

Pelletier screamed to the defendant to dial 911. The defendant returned to the apartment and dialed 911. With a flat affect, he told the operator, "I just stabbed two people," and provided the address of the apartment. A few minutes later, the defendant contacted the 911 operator again. In an angry voice, he stated, "I just fucking called and I stabbed two people." The defendant asked why help had not arrived. In response to questions from the operator, he provided his name and the names of the victims. The defendant also stated that he was "going insane," that he believed that [Valli] was dead, and that "there's blood everywhere." The defendant sounded upset. He stated, "I'm fucked up man," "I cannot believe I did this," and "He's fucking dead dude, hurry up." Seconds later, the defendant yelled, "He's fucking dead!" A few seconds later, the defendant, in an angry voice asked, "Why aren't they here man?" The operator stated that help was there and directed the defendant to "buzz the door." The defendant replied, "They're not even fucking here," and was agitated about having to "buzz the door."

Sergeant Richard McCarthy of the Newburyport police department responded to the scene a few minutes later. He encountered the defendant outside the apartment. The defendant was not wearing a shirt, and his arms and pants were covered in blood. The defendant loudly asked, "Where's the ambulance? Where's the ambulance?" He then told Sergeant McCarthy, "I'm the one that did it. I'm the one that stabbed them." Another officer, Ronald

principally through the defendant's statements to the police, which were admitted in evidence.

Senter, handcuffed the defendant and put him in the back of his police cruiser. Inside the apartment, Valli was lying facedown on the mattress and was covered in blood. On the walls near the mattress, there were cast off bloodstains[3] and medium velocity impact spatter.[4]

An ambulance arrived. Sergeant McCarthy asked the defendant if he needed medical attention. The defendant replied that he did not. He also stated, "I'm crazy. I'm off my medication. I just went berserk." The defendant then asked, "Are they alright: I think [Valli's] dead, isn't he?"

At the police station, the defendant was given Miranda warnings and, at about 4:45 A.M., gave a statement to police. He appeared to be sober and was not slurring his words. In his statement, the defendant recounted the following. He lived with his parents and younger sister, worked at a local restaurant, and had not graduated from high school due to a long-standing problem he had with depression. He had been diagnosed with having depression five years before. He was taking a prescription medication for his depression, Celexa, and his daily dose was recently doubled to forty milligrams. The defendant acknowledged that, while taking this medication, he should not consume alcoholic beverages.

The defendant further told the police that he had been a friend of the victims for many years. At their apartment, he drank about six bottles of "Mike's Hard Lemonade" and four "twisted teas."[5] After going to bed on the mattress with the victims, he woke up and heard voices inside his head. The voices told him "to take them out." He went to the kitchen area of the apartment and retrieved a knife. He lay on the mattress and "was there for about five minutes and [was] thinking of where I should put it first." He then repeatedly stabbed Valli, who woke up, stood up, and asked, "What's going on?" Because the knife with which he had stabbed Valli broke, the defendant went back to the kitchen

---

[3]A cast off bloodstain is a bloodstain "produced from a bloody object that [is] in motion."

[4]Medium velocity impact spatter is blood spatter generated by a medium force that is applied to a blood source. The "medium force" involved is usually caused by a blunt force trauma, such as force inflicted with a knife.

[5]A "twisted tea" is a malt liquor beverage that tastes like iced tea.

to get another knife. He then stabbed Pelletier, who was sleeping on the mattress. When Pelletier yelled, "What are you doing? Call 911," "something snapped," and the defendant "returned to normal." The defendant stated that he and Pelletier were no more than friends, and that there was no reason for his actions. He further remarked that the victims "were just at the wrong place at the wrong time," and that he was "sorry" for "what [he] did."

We now summarize the defense case. The defendant did not testify. Through cross-examination of the prosecutor's witnesses, the defendant maintained that the police had not properly investigated the case insofar as they failed to pursue the defendant's claim of hearing voices.

Several lay witnesses testified for the defense, including the defendant's mother, father, and sister. The defendant was one of five children. Commencing in his youth, he had consistent nightmares. When he was in first grade, it was discovered that he had learning disabilities and he was provided with special education services. He continuously received special education services until he dropped out of high school during his senior year.

Sometime around or after the defendant completed the eighth grade, his mood changed and he became reclusive. This condition became more severe when he turned sixteen years of age. The defendant broke a lot of household rules and had repeated conflicts with his parents. He moved out of the house for a while and lived with a friend. After his father brought him back home to live, the defendant attempted to commit suicide by ingesting numerous pills, and was hospitalized.

When the defendant came home, he appeared to be even more depressed. He started to see a psychologist, and later started taking Prozac, an antidepressant medication. He seemed to be nicer to others when he was on his medication.

The defendant's depression did not thereafter improve. In May or June of 2001, he told his younger sister that he was hearing angry voices that were telling him to do bad things. She told him that if he had problems with the voices, he could page her and she would come and get him. Thereafter, and through September 14, 2001, the defendant would page his younger sister about three times per week. He appeared to be very depressed and emotionless during the summer of 2001.

On August 15, 2001, the defendant went to an appointment with a different health care professional, Anita Freeman. At that appointment, his antidepressant medication, now Celexa, was doubled from twenty milligrams to forty milligrams. After this appointment, he was agitated. He told his mother that he was hearing angry voices that were telling him to do bad things.[6] He was crying and stated that he could not stand the pain in his head any longer. The defendant's mother made him an appointment for August 28, at a different health care facility that they had not previously visited.

At that appointment, the defendant saw Dr. Thomas McDonough, a psychologist. The defendant indicated that he did not believe that his current medication, Celexa, was working, that he was depressed and not sleeping well. He stated that ideas of suicide came and went, and that he felt some "weird stuff." He also acknowledged "excessive" alcohol consumption a few times per week, as well as previous drug use. After speaking with the defendant, Dr. McDonough was satisfied that the defendant could work through his issues and make it to the next appointment without harming himself or others. Dr. McDonough diagnosed him as suffering from alcohol abuse and dysthymic depression.[7] The defendant did not tell Dr. McDonough that he was hearing or had heard voices.

Following his arrest, forensic psychologist Dr. Lorraine Selsor was assigned to evaluate the defendant's competency to stand trial. Dr. Selsor interviewed the defendant on September 14, 2001. He appeared depressed, withdrawn, and sad. He was not very verbal, and made little eye contact with her. He told Dr.

---

[6]Apart from his mother and younger sister, the defendant told others that he heard voices. In October or November of 2000, the defendant displayed a pocket knife to Rebecca Provencher, a friend of his younger sister. He stated, "We all should just get together and go out and kill." Provencher asked him what he was talking about. The defendant replied, "It was just the voices in my head," and then stated, "I was just kidding." In April or May of 2001, the defendant told his friend Joshua Marshall that he was hearing voices.

[7]Dr. McDonough explained that "dysthymic" depression is not as severe as "major" depression. With dysthymic depression, a person can function, but does not experience "a very happy life and they feel like they're just dragging themselves through life." Depression that is characterized as "major" is more "paralyzing," where the person suffering "can barely sleep ever, wouldn't be able to eat, los[es] a lot of weight [and] feel[s] a lot more suicidal."

Selsor that he had been experiencing auditory hallucinations since he was a teenager, and that he had been hearing voices when he stabbed the victims. Dr. Selsor recommended that the defendant undergo further evaluation to determine competency and criminal responsibility. She also advised that he be placed on "suicide precautions."

The defendant also presented the testimony of two experts, psychologist Robert H. Joss and forensic psychiatrist Montgomery C. Brower, to support his claim that he was not criminally responsible under the standards set forth in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). Both had evaluated the defendant prior to trial.

Based on his review of records, interviews with the defendant, interviews with the defendant's parents, and psychological testing, Dr. Joss concluded that, at the time of the stabbings, the defendant suffered from a mental disease, namely, major depression with an overlay of a schizotypal personality disorder.[8] Dr. Joss opined that the defendant had some degree of brain dysfunction, which was supported by the fact that he required special education services and had large discrepancies between verbal and performance intelligence test scores (suggesting a left hemisphere brain problem). Dr. Joss expressed the opinion that, at the time of the stabbings, the defendant was suffering from a mental disease (and possibly mental defect) that deprived him of the substantial capacity to appreciate the wrongfulness of his conduct and interfered with his ability to conform his conduct to the requirements of the law.

Dr. Brower rendered his opinion based on his review of materials that Dr. Joss consulted, as well as photographs of the defendant taken shortly after his arrest, and certain tests that he ordered, including an MRI brain scan and an electroencephalogram, which traces electrical activity in the brain, both of which came back "normal." He also interviewed the defendant, as well as the defendant's parents and people who knew the defendant socially.

---

[8]Dr. Joss testified that a schizotypal personality disorder involves the development of a sense whereby "the world makes more sense to [the person with the disorder] than it does for the rest of us." The disorder can involve unusual perceptual experiences, odd beliefs or bizarre fantasies, a constricted range of affect, and a lack of close friends outside of the family.

Dr. Brower concluded that, at the time of the stabbings, the defendant was mentally ill and was experiencing psychotic symptoms (but was not psychotic). Dr. Brower explained that the defendant's psychotic symptoms could have resulted from his schizotypal personality disorder, his history of alcohol and drug use, and temporal lobe dysfunction. Dr. Brower concluded that, at the time of the stabbings, the defendant's psychotic symptoms interfered with his ability to conform his conduct to the requirements of the law. He also expressed his opinion that, if the defendant had had a seizure on account of temporal lobe epilepsy, then that would have deprived him of the substantial capacity to appreciate the wrongfulness of his conduct. Both Dr. Joss and Dr. Brower rejected any malingering by the defendant.

To rebut the defendant's expert evidence, the Commonwealth called two expert witnesses, Dr. Ira K. Packer, a psychologist, and Dr. Malcolm P. Rogers, a psychiatrist. Dr. Packer, the director of forensic service in psychology at Bridgewater State Hospital, evaluated the defendant to determine competency and criminal responsibility. He reviewed police reports, Dr. Selsor's report, and other materials, and conducted three different psychological tests. He also interviewed the defendant on five separate occasions.

Dr. Packer testified that the psychological test results "were not really consistent with somebody having a real mental illness," and showed that although the defendant experienced depression, he was not psychotic. Dr. Packer explained that a person having a genuine psychotic disorder would ordinarily hear voices coming from outside his head, not from within his head, which is what the defendant reported. The defendant's account that he was lying on the mattress for five minutes thinking of where to stab Valli was inconsistent with someone who is compelled to respond to command auditory hallucinations, because a person experiencing such hallucinations does not reflect. The defendant's lack of remorse also suggested that he lacked a genuine psychotic disorder. Dr. Packer explained that it is very unusual to have a psychotic break for only as long as the crime lasts.

According to Dr. Packer, the defendant did not meet the criteria for having a schizotypal personality disorder. Although he had a history of depression, the defendant's depression was not severe on the day of the stabbings. Dr. Packer expressed the

opinion that the defendant had the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. Significant to his conclusion were the facts that the defendant, by his own account, was able to think for five minutes about where to stab Valli, and was able to retrieve a second knife after the first broke.

Based on his review of records and reports, the defendant's telephone calls to 911, and an interview with the defendant, Dr. Rogers also expressed the opinion that the defendant was criminally responsible when he stabbed Valli and Pelletier. Dr. Rogers testified that the defendant did not have a schizotypal personality disorder. He explained that, although the defendant suffered from depression, it did not reach "psychotic proportions" and he was not experiencing a psychotic episode at the time of the stabbings. Significant to Dr. Rogers's determination were the following factors: the defendant heard voices only inside his head (not outside); the defendant experienced no delusions (a false belief that is clearly improbable and not logical); psychosis is not brief, and usually lasts hours, a day, and more typically weeks and months, not minutes; and psychosis occurs and ends gradually, not abruptly. Dr. Rogers added that neither the defendant's failure to take Celexa, nor his failure to heed the warning to avoid drinking while taking Celexa, would trigger a psychotic event. Dr. Rogers rejected the suggestion that the defendant suffered temporal lobe seizures. He came to this conclusion based on a lack of evidence that the defendant engaged in some kind of repetitive behaviors indicative of seizure activity, such as odd movements, lip smacking, or hand wringing.

*Discussion.* 1. *Evidentiary issues.* The defendant argues that the judge erred in excluding the testimony of two friends who would have testified that the defendant told them that he had heard voices in the past.[9] The issue was first raised prior to opening statements when defense counsel represented that he intended to call witnesses who would testify that the defendant told them

---

[9]More particularly, about two weeks prior to September 14, 2001, the defendant told Katelyn Frothingham that he "had been hearing voices," and a couple of days prior to September 14, 2001, the defendant told a coworker, Kyle Harris, that he was taking medication because he "hears voices sometimes." This testimony was established at a voir dire of each witness.

he heard or was hearing voices, to prove that the defendant was in fact hearing voices. The judge ruled that the statements were hearsay, but might be admissible to prove the defendant's state of mind at the relevant time under the exception for statements of present condition, citing Proposed Mass. R. Evid. 803 (3). The judge further opined that to be admissible under this exception the statements must have been made close to September 14 and must reflect the defendant's then present state of mind — and not, for example, be statements of the defendant that he had heard voices in the past.

The issue next arose after defense counsel's cross-examination of one of the investigating State troopers. During that cross-examination, defense counsel elicited testimony that the trooper did not ask any of the defendant's family or friends whether the defendant had told them that he heard voices. This questioning was part of the defendant's effort to establish that the police had conducted an inadequate investigation and purposefully avoided gathering evidence that might have confirmed the defendant's story that he heard voices telling him to stab the victims. In response, the prosecutor elicited testimony from several witnesses called to testify about the defendant and the party on September 13, to the effect that the defendant never told them he heard voices. There was no objection to these questions. However, after their testimony, defense counsel argued that the prosecutor had "opened the door" to testimony by persons whom the defendant had told about hearing voices, and that he should be entitled to "put it all on" in rebuttal. The judge disagreed that any door had been opened, and held to his prior ruling.

The next day, at the beginning of the defense case, defense counsel again raised the issue, arguing that the statements were not being offered for their truth (i.e., that the defendant was actually hearing voices), but as "symptoms of the mental illness." In revisiting the issue, the judge rejected this argument and affirmed his prior ruling that the statements were being offered for "the truth of the matter that [the defendant was] hearing voices," but that they were probably admissible under the hearsay "exception of declaration of mental condition." He then ruled that defense witnesses would be able to testify that the defendant told them he was hearing voices, even if those conversations occurred months

before September 14, so long as the statements were to the effect that the defendant was then hearing voices, and not statements about hearing voices sometime in the past.

As noted above, a number of defense witnesses, including the defendant's mother; his younger sister; and two friends, Rebecca Provencher and Joshua Marshall, proceeded to testify about statements the defendant made to them about hearing voices in the months leading up to September 14. Two other witnesses, Katelyn Frothingham and Kyle Harris, friends of the defendant, were not permitted to testify on this subject because the judge concluded, after a voir dire, that the statements made to them were statements about hearing voices in the past, see note 9, *supra*, and the judge ruled that they did not fall within the exception for statements of present mental condition (or state of mind).

There was no error. The statements were plainly offered for their truth, that is, that the defendant was hearing voices (a symptom of mental illness),[10] and the exception for statements of a declarant's present state of mind was inapplicable. The judge's ruling that the statements made to Frothingham and Harris fell outside of the exception because they were statements concerning the defendant's past rather than his present state of mind was a reasonable application of the rule. The defendant's argument, if accepted, would in effect allow the exception to swallow the rule. Moreover, in the context of the entire trial, it is unlikely that the statements of Frothingham and Harris would have had any effect on the verdict. Cf. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). The proffered statements were cumulative of other admitted evidence from the defendant's family and friends.

We also reject the defendant's argument that the testimony of Frothingham and Harris was admissible rebuttal evidence. "A judge has broad discretion to permit rebuttal testimony." *Commonwealth* v. *Roberts*, 433 Mass. 45, 51 (2000). "Rebuttal is legitimate when it responds to the opponent's case; . . . the judge . . . has nearly unreversible discretion to allow [or refuse to allow] it." *Id.*, quoting *Commonwealth* v. *Johnson*, 41 Mass. App. Ct. 81, 89 (1996). The defendant overlooks that the

---

[10]This differs somewhat from the often used example of an accused's statement that "I am Napoleon" being admissible not for the truth that the declarant is Napoleon, but to prove that the speaker is mentally ill.

testimony of the prosecution witnesses was elicited in response to the defendant's cross-examination of one of the police officers. The prosecutor's questioning of these witnesses showed that police failure to inquire about the defendant hearing voices had not hindered the police investigation and, essentially, was of no consequence because the defendant had not told them anything with regard to the subject. This line of questioning was proper. See *Commonwealth* v. *Howell*, 49 Mass. App. Ct. 42, 50-51 (2000) (prosecutor may rebut defendant's theory of defense). The judge acted within his considerable discretion to exclude the testimony of Frothingham and Harris as further "rebuttal" evidence because, in the context of trial, the testimony of Frothingham and Harris did not rebut the testimony of the witnesses that the defendant did not tell them that he heard voices. See *Commonwealth* v. *Roberts, supra.*

2. *Prosecutor's closing argument.* The defendant argues that the prosecutor's closing argument contained an improper comment on motive that lacked support in the evidence and improperly spoke to the defendant's failure to testify. Remarks made during closing arguments are considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury. *Commonwealth* v. *O'Connell*, 432 Mass. 657, 659 (2000), and cases cited. Before closing arguments commenced, the judge instructed the jury that the closing arguments of counsel do not constitute evidence. In his final charge, the judge told the jury that what the lawyers say is not evidence.

a. We first take up the defendant's contention that several portions of the prosecutor's closing argument regarding motive were unsupported by evidence. The five challenged passages are as follows:

> (i) "These were two friends of his in their house that night. I suggest to you, something probably happened to trigger [the stabbings]. . . . Who knows what was going through [the defendant's] mind when he and [Pelletier] are sitting there for two hours talking on the couch that night. Some innocent comment could have been in his mind after that."

> (ii) "Now, did he do something without a motive, ladies

and gentlemen? No, he didn't. He had a motive. Was it a good motive? Was it an irrational motive? Was it something that made sense? Was it something — no. No. I don't know. Who knows what was in his mind. He didn't tell us."[11]

(iii) "He didn't tell us. He didn't tell them. That's because there was no reason [*sic*[12]]. The reason is hidden. He didn't tell anybody the reason, the same reason he didn't tell anybody that [Valli] got up and they spoke. He has a reason. He had a reason. It wasn't a good one because [Valli] didn't do anything to deserve being killed."

(iv) "This was a crime of passion. This is a crime of extreme emotion. . . . This is a crime involving a man who was angry at them, who wanted to hurt them, who wanted to maim them. . . . He was angry at them. . . . It was a . . . passionate angry attack."

(v) "Now, whether [the defendant's] anger was displaced because of his conflict with his father or whether it was pure resentment and jealousy and rage about their happiness, I can't tell you that, but I can tell you that what happened that night was motivated by personal animosity on his part toward those people."

The defendant maintains that the prosecutor, despite openly acknowledging that he had no idea of what the defendant's motive was, repeatedly engaged in improper and prejudicial speculation on the issue of motive. Because the defendant objected to this line of argument, we review to determine whether the remarks were improper and, if so, whether they were harmless. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 805 (2002).

---

[11]The prosecutor's statements, "He didn't tell us," appearing in this excerpt (ii) and again in excerpt (iii), are discussed *infra* in connection with our consideration of the defendant's claim that the prosecutor commented improperly on the defendant's failure to testify.

[12]This sentence, "That's because there was no reason," is set out as it appears in the trial transcript. Either the prosecutor unintentionally omitted a word or there is a typographical error, because when it is considered in the context of the sentences that follow immediately thereafter, it is contradictory and makes little sense. Presumably, the sentence should read, "That's *not* because there was no reason."

"Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom." *Commonwealth* v. *Guy,* 441 Mass. 96, 110 (2004). "Arguments based on testimony submitted at trial and its logical conclusions are proper . . . ." *Commonwealth* v. *Colon,* 449 Mass. 207, 224-225, cert. denied, 128 S. Ct. 810 (2007). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Commonwealth* v. *White,* 452 Mass. 133, 136 (2008), quoting *Commonwealth* v. *Bush,* 427 Mass. 26, 30 (1998).

The remarks in (i) were permissible. By the defendant's own account in his statement to the police, he and Pelletier had stayed up talking by themselves for a while before they joined Valli on the mattress. During this time, the defendant got "emotional about his brother" possibly being deployed to Afghanistan. This evidence, considered with Dr. Packer's testimony that there is no such thing as no motivation[13] — testimony specifically referred to by the prosecutor in his closing — supported the prosecutor's remarks and reflected reasonable inferences that could have been drawn from the evidence. See *Commonwealth* v. *Ashley,* 427 Mass. 620, 624-625 (1998) (no requirement that evidence of motive be conclusive to be admissible).

Based on Dr. Packer's testimony concerning motivation, the prosecutor's remarks in (ii) and (iii), at least as they relate to motive, also were permissible.[14]

The remarks in (iv) were proper. That the defendant violently

[13]Dr. Packer explained: "There's no such thing as no motivation. There may be somebody not being able to tell you exactly what their motivation was, but there's no such thing as no motivation. . . . [E]ven when somebody who's genuinely schizophrenic says they're hearing voices, you know, we need to all be clear that there aren't real voices. . . . [T]here may not be a rational reason for [a defendant's conduct], but there's always a motivation."

[14]Although the defendant did not specifically challenge it at trial and does not do so on appeal, the prosecutor's reference to the defendant's not "tell[ing] anybody that [Valli] got up and they spoke" in (iii) is troubling. There was evidence that the defendant had stated to Dr. Packer that after Valli got up from the mattress and the defendant got up as well, the two may have spoken. There was also evidence that, when he made his statement to police following his arrest, the defendant did not include the information that he and Valli may have exchanged words before he stabbed Valli. Although the prosecutor's statement about not "tell[ing] anybody," if understood to mean not telling the police, might be a permissible inference to draw from these two pieces of

attacked the victims was supported by the number and nature of stab wounds to the victims. One of the wounds to Valli was so deep that it penetrated his lung and heart; the defendant used such force on Valli that he broke the knife and went back to obtain another, which he then used to stab Pelletier; and among other places, the defendant slashed both Valli and Pelletier in the face.

The remarks in (v) were also permissible. In addition to Dr. Packer's testimony on motive, there was evidence that the defendant had conflict with his parents, that the defendant had attempted suicide after his father made him return home to live, that the victims were happy, that the defendant was depressed, and that the attack against the victims was violent and brutal. This evidence, and reasonable inferences therefrom, supported the challenged remarks.

We add that the defendant's trial counsel forcefully argued that the lack of motive in the case supported the fact that the defendant suffered mental illness and that he could not be criminally responsible for the stabbings. The prosecutor was entitled to respond to this argument. See *Commonwealth* v. *Anderson*, 411 Mass. 279, 286 (1991).

b. The defendant also asserts that the prosecutor improperly commented on his failure to testify by twice remarking, "[h]e didn't tell us [his motive for the stabbings]." (See [ii] and [iii] quoted *supra*.) These remarks, the defendant maintains, deprived him of his constitutional right to remain silent.[15] Because there was no objection, we review any improper remarks to determine whether they created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Morales*, 440 Mass. 536, 550-551 (2003).

evidence, the defendant's statement to the expert witness was not admissible substantively, and thus could not be used as an evidentiary source of the prosecutor's statement. See, e.g., *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 & n.1 (2001). Nevertheless, viewing the prosecutor's argument as a whole, we do not conclude that this reference created a substantial risk of a miscarriage of justice.

[15]We note that the defendant did not object at trial to the remarks now challenged and "consider [that omission] as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.' " *Commonwealth* v. *Lyons*, 426 Mass. 466, 471 (1998), quoting *Commonwealth* v. *Mello*, 420 Mass. 375, 380 (1995).

There is no question that the phrase, "He didn't tell us," considered by itself, appears to be a direct comment on the defendant's constitutionally protected right not to testify at trial, and there is also no question that the prosecutor's choice of this phrase, and repetition of it, were unfortunate. But the phrases must be read in the context in which they were stated; we quote the full text of this portion of the prosecutor's closing statement in the margin.[16] As reflected there, the prosecutor immediately followed his first reference to "he didn't tell us" by mentioning the portions of the defendant's statements to the police after his arrest in which the defendant said that he heard a voice telling him "to take them out," and that he sat there and thought about it. We think that in the context of the prosecutor's surrounding argument — including his specific mention of the defendant's giving a statement to the police a little earlier — it would have been reasonably clear to the jury that the prosecutor was referring to the fact that the defendant, in his statement to police, did not

---

[16]The prosecutor argued:

"Now, did [the defendant] do something without a motive, ladies and gentlemen? No, he didn't. He had a motive. Was it a good motive? Was it an irrational motive? Was it something that made sense? Was it something — no. No. I don't know. Who knows what was in his mind. *He didn't tell us.* All he says is he had a voice, which we've heard evidence about. It was a thought, an idea, an image, a little devil on his shoulder, in his head telling him to take them out. And he sat there and thought about it and then he acted on it.

"He could not tell us why he did that. He could not tell us why — and I asked both of these experts why was he compelled to follow that thought, that voice. They couldn't tell us. Does that make sense to you?

"You heard from the experts that, even if you're psychotic, even if you're schizophrenic, even if you're in the throes of delusions, there are reasons — you're wrong about reality, you're wrong about what you're perceiving, but you're still motivated by something. You're doing something for a reason. The reason might be — to an objective reality observer, completely nutty, but to you, in that state, there's a reason you do things. *He didn't tell us.* He didn't tell them. That's because there was no reason. The reason is hidden. He didn't tell anybody the reason, the same reason he didn't tell anybody that [Valli] got up and they spoke.

"He has a reason. He had a reason. It wasn't a good one because [Valli] didn't do anything to deserve being killed. He wasn't defending himself. This is a murder case." (Emphasis added.)

state a reason for stabbing the victims. We also think that the jury would have understood the second reference to "He didn't tell us" as a repetition of the first, that is, another reference to the defendant's statement to the police, followed by a reference to his conversations with the psychological and psychiatric experts ("He didn't tell them"). In this regard, we note that defense counsel, who interrupted the prosecutor's argument on several occasions to object, did not do so in connection with these statements. Nor did defense counsel mention these statements in the objections he lodged against the prosecutor's closing at its completion. The absence of objection, while not dispositive, may suggest that the manner and tone of the argument were not unfairly prejudicial.

A prosecutor is entitled to comment on a defendant's statement to police and omissions therefrom. See *Commonwealth* v. *Morales, supra* at 551; *Commonwealth* v. *Martino,* 412 Mass. 267, 282-284 & n.11 (1992). And in this case, as has been stated, the prosecutor was entitled to meet the argument advanced by defense counsel that the absence of affirmative motive evidence demonstrated the defendant's mental illness and lack of criminal responsibility. See *Commonwealth* v. *Anderson, supra* (prosecutor entitled to respond to argument made by defendant's trial counsel). Assuming the prosecutor's challenged remarks constituted error, we conclude that when they are viewed in the context of the prosecutor's closing argument as a whole and the judge's instructions, they did not create a substantial risk of a miscarriage of justice.

3. *Jury instructions.* The defendant contends that, in three respects, the judge gave an incomplete and erroneous instruction on the role of voluntary intoxication in determining criminal responsibility. The judge instructed the jury, in pertinent part:

> "Lack of criminal responsibility is not present when a defendant with a mental disease or defect knows or, in the circumstances, has reason to know, that his consumption of a substance will cause him to be substantially incapable of either appreciating the wrongfulness of his conduct or conforming his conduct to the requirement of the law or both. In deciding what the defendant had reason to know about the consequences of his consumption of a substance,

you should consider the question solely from the defendant's point of view, including his mental capacity."[17]

During deliberations, the jury asked the judge for "more guidance on substance abuse, alcohol/drug, with respect to law of criminal responsibility." The judge responded by explaining (without objection): "Intoxication caused by the voluntary consumption of alcohol or drugs cannot be the basis for concluding that the defendant lacked criminal responsibility. Alcoholism or drug addiction is not a mental disease or defect within the meaning of the test for lack of criminal responsibility." The judge then repeated his initial instruction quoted above.

a. The defendant claims that the charge was incomplete because it did not contain language similar to what is commonly referred to as a *"Herd"* instruction.[18] See *Commonwealth* v. *Herd*, 413 Mass. 834, 839 (1992). He objected to the charge on this ground. The defendant contends that the instruction was warranted because there was evidence that alcohol consumption could have "triggered" his mental illness. There was no such evidence. The defendant points to the testimony of Dr. Brower, who stated that Rebecca Provencher (a friend of the defendant's sister) informed him that the defendant had reported hearing voices to her while he was intoxicated in October or November of 2000. That testimony, however, was hearsay and was admitted only to demonstrate the basis for the doctor's opinion. See *Commonwealth* v. *Brown*, 449 Mass. 747, 768-769 (2007). Provencher's account of that incident clarified that the defendant had been drinking, but had "not overly drank." Evidence that the defendant heard voices after consuming some alcohol, however, is not the equivalent of evidence that alcohol consumption actu-

---

[17]This part of the instruction mirrors the instruction contained in the Model Jury Instructions on Homicide 52-53 (1999).

[18]The defendant requested the following instruction: "However, if the defendant suffers from a mental disease or defect that is activated by the consumption of alcohol or drugs and that results in the lack of a substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, then the defendant is not criminally responsible. If the Commonwealth proves beyond a reasonable doubt that the defendant knew or subjectively had reason to know the consumption of alcohol or drugs would trigger the underlying mental disease or defect, then the defendant does not lack criminal responsibility due to the alcohol or drugs activation theory."

ally triggered the defendant's mental illness. The defendant offered no expert evidence on the issue. While Dr. Rogers testified that heavy drinking may render the defendant's antidepressant, Celexa, ineffective, there was no evidence that heavy drinking, while taking Celexa, would result in anything other than depression. Significantly, there was no evidence contradicting Dr. Rogers's testimony that drinking while taking Celexa would not trigger a psychotic event. There was no error in declining to give the requested instruction because the evidence did not support it. See *Commonwealth* v. *Shelley*, 381 Mass. 340, 351 (1980).

b. We reject the defendant's argument, made for the first time on appeal, that the judge's instruction created a substantial likelihood of a miscarriage of justice because it omitted the terms "of itself" or "solely" from the part of the instruction that explained that voluntary intoxication "cannot be the basis for concluding that the defendant lacked criminal responsibility." The judge's instruction, read in its entirety, see *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993), correctly relayed that alcoholism resulting from voluntary consumption cannot be the basis for concluding that the defendant lacked criminal responsibility because such a condition does not qualify as a mental disease or defect. See *Commonwealth* v. *Herd, supra.* That said, there are circumstances in which a defendant's voluntary intoxication can be a basis for concluding that a defendant lacked criminal responsibility, namely, when it "activated" a latent mental disease or defect as more thoroughly explained in the *Herd* decision. See *id.* at 843-844. However, because there was no evidence that the defendant's voluntary consumption of alcohol activated his mental illness, the omissions complained of are of no consequence.

c. We agree with the defendant that the "reason to know" portion of the charge was not warranted by the evidence. Because the defendant did not object to the instruction on that basis below, we consider whether the instruction created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Oliveira*, 445 Mass. 837, 842 (2006). We conclude that it did not. The instruction itself was correct. Because there was no evidence that the defendant knew that alcohol consumption would exacerbate his mental condition, the instruction, in essence, was superfluous. The charge as a whole, particularly with the judge's

directive that it was the Commonwealth's burden to prove that the defendant was criminally responsible, fairly instructed the jury.

4. *Review under G. L. c. 278, § 33E.* We have carefully reviewed the entire record pursuant to G. L. c. 278, § 33E. While it is apparent that this is a tragic case for all of the parties and their families, we conclude that there is not a basis on which to order a new trial or to direct entry of a lesser degree of guilt on the murder conviction. Although the defendant had a history of depression, two expert witnesses for the Commonwealth gave their opinions that he was criminally responsible for the stabbings, and there was evidence to support premeditation on the defendant's part. We decline to disturb the jury's verdict on the murder indictment.

*Judgments affirmed.*